IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS,
HOUSTON DIVISION

| | |
|---|---|
| GALVESTON BAYKEEPER, INC., <br><br> Plaintiff, <br> vs. <br><br> TRENDMAKER HOMES, INC., a Texas corporation, and TRENDMAKER CLEAR LAKE, LLC, a Texas limited liability company, <br><br> Defendants. | Civil Cause No.: <br> _____ |

# ORIGINAL COMPLAINT

## INTRODUCTION

1. Plaintiff Galveston Baykeeper ("Baykeeper") brings this citizen suit under § 505(a)(1) of the Clean Water Act, 33 U.S.C. §1365(a)(1). Baykeeper seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorneys' and expert witness fees, for Defendant Trendmaker Homes, Inc.'s and Trendmaker Clear Lake, LLC's (collectively "Trendmaker" or "Defendants") repeated, ongoing and continuing violations of Sections 301(a) and 404 of the Federal Water Pollution Control Act also known as the Clean Water Act (hereinafter "Clean Water Act" or "CWA"), 33 U.S.C. §§ 1311(a) and 1344, for the unpermitted discharge of dredged and/or fill material into the waters of the United States in violation of section 404 of the Clean Water Act, 33 U.S.C. § 1344, which is occurring as a result of Defendants' residential subdivision development in Clear Lake ("Development Site").

1

2. In this action, Plaintiff sues to enjoin further wetland destruction until Defendants obtain a § 404 permit. Plaintiff's members regularly visit the wetlands and open waters that are supported by wetlands Defendants have filled, and Plaintiff's members have an interest in preserving the vital functions those wetlands perform in connection with Armand and Horsepen Bayous, as well as with Galveston Bay. Plaintiff seeks to ensure that the proper wetland-loss procedures are followed so that the ecological health of the watershed is protected.

3. Defendants have discharged and are continuing to discharge dirt, soil, clay and dredged material into waters of the United States.

4. Defendants have neither sought nor received the required CWA permit for their dredge and fill activities.

5. Defendants' ongoing violations of the CWA have caused, and will continue to cause, unless abated, significant damage to the coastal prairie wetland ecosystem that Plaintiff and its members use and enjoy.

## JURISDICTION AND VENUE

6. Jurisdiction over this action is conferred by 28 U.S.C § 1331 (federal question) and 33 U.S.C. § 1365(a) (Clean Water Act citizens suit provision). This Court has subject matter jurisdiction over the claims specified in the Complaint under 33 U.S.C. § 1365(a). An actual, justiciable controversy exists between Plaintiff and Defendants. The requested relief is proper under 28 U.S.C. §§ 2201 and 2202.

7. Venue is appropriate in this District pursuant to 33 U.S.C. § 1365(c) because the source of all of the Clean Water Act violations complained of is located in Harris County, Texas, and within the Southern District of Texas.

## NOTICE

8. By letter postmarked on November 27, 2013, pursuant to 33 U.S.C. § 1365(b)(1)(A), Plaintiff notified Defendant Trendmaker Homes, Inc., its registered agent, Defendant Trendmaker Clear Lake LLC (via Trendmaker Homes, Inc.), the United States Environmental Protection Agency ("EPA"), and the Texas Commission on Environmental Quality ("TCEQ") of Defendants' CWA violations and of Plaintiff's intent to sue Defendants under the Clean Water Act and all parties received this Notice. A true copy of the notice letter is attached to this complaint as Exhibit 1. The allegations in the notice letter are incorporated herein by this reference.

9. More than sixty days have passed since notice was served, and the violations complained of in the notice letter are continuing and are reasonably likely to continue to occur. Defendants are in violation of the CWA.

10. Neither EPA nor the State of Texas has commenced and diligently prosecuted an action that would preclude this action under either 33 U.S.C. §§ 1319(g)(6) or 1365(b)(1)(B).

## PARTIES

11. Defendant Trendmaker Homes, Inc. is a home-construction company and a domestic business corporation conducting business in the State of Texas. Trendmaker Homes, Inc. has offices at 16340 Park Ten Place, Suite 250, Houston, Texas 77084.

12. Defendant Trendmaker Clear Lake, LLC is a limited liability company created by Trendmaker Homes, Inc. for the sole purpose of developing the Clear Lake

subdivision. Both Trendmaker Homes, Inc. and Trendmaker Clear Lake, LLC share the same registered agent.

13. At all relevant times, Defendants have owned a portion of land east of Space Center Boulevard and to the west of Red Bluff Road, at the intersection of El Dorado and Space Center Boulevard in Harris County, Texas.

14. Defendants' actions on its property thus far include the commencement of development activities, such as bulldozing and the clearing of vegetation, leading to the discharge of fill material into jurisdictional wetlands with a significant nexus to Armand and Horsepen Bayous. Defendants' actions were undertaken without the required permit as specified by the CWA, and therefore are in violation of federal law.

15. Plaintiff Galveston Baykeeper ("Baykeeper") is suing on behalf of itself and its members. Baykeeper is a nonprofit public benefit conservation organization incorporated in the State of Texas. Its principal place of business is in Seabrook, Texas and Baykeeper has approximately 500 members. Baykeeper is a membership organization and has members who are injured by Defendants' violations.

16. Baykeeper is a non-profit "501(c)(3)" conservation organization. Baykeeper is a grassroots organization committed to preserving and protecting the health of Galveston Bay and its watershed for our children and their progeny, their economy and their future through advocacy and education and enforcement of the CWA.

17. Baykeeper has members, supporters, and staff (collectively "members") who regularly use and enjoy the waters in and around Armand and Horsepen Bayous, including the waters affected by the violations at issue in this case. Baykeeper's

4

members, supporters, and staff engage in outdoor recreation like canoeing, hiking, fishing, birdwatching, and photography, as well as other recreational, educational, environmental, scientific, and vocational activities of interest near this wetland and in Armand and Horsepen Bayous. Baykeeper members regularly provide eco-tours of Armand Bayou on pontoon boats operated by the Armand Bayou Nature Center and have done so for years. Baykeeper members, supporters, and staff plan to continue to use and enjoy these areas and waterways for recreational, vocational, educational, and environmental purposes in the future and have specific and near-term plans to return to use such waters for the uses described above in the spring and summer of 2014.

18. The dredging and filling activities and the pollutants discharged by Defendants negatively affect aquatic habitat values for fish and other aquatic wildlife and birds, decrease populations of these species and therefore decrease Plaintiff's members' ability to successfully fish, observe fish, bird watch, and recreate both in the area adjacent to the discharges as well as upstream and downstream areas such as Armand Bayou and Horsepen Bayou that are ecologically and hydrologically connected to the areas most directly affected by Defendants' discharges.

19. Ongoing pollution from Defendants also deters Galveston Baykeepers' members from using and enjoying such waters as they otherwise would because of reasonable and scientifically-based concerns about the adverse effects of Defendants' discharges and dredge and fill activities.

20. Plaintiff has organizational standing to bring this action. Plaintiff has been actively engaged in a variety of educational, scientific, and advocacy efforts to protect the water quality of Armand and Horsepen Bayous, as well as the quality of Galveston

Bay. Defendants have failed to obtain the necessary CWA permits to authorize the activities that have resulted, and continue to result, in discharges into the wetland and the downstream waters of Armand and Horsepen Bayous. As a result, Plaintiff has had to dedicate its limited organizational resources to identifying and tracking Defendants' actions that are not in compliance with the Clean Water Act. Plaintiff's organizational interests in protecting the water quality of Armand and Horsepen Bayous and Galveston Bay are directly injured by Defendants' unpermitted discharges.

21. Plaintiff is also being deprived of information to which it is statutorily entitled under the Clean Water Act. Defendants are discharging and intend to continue discharging fill material into the wetland connected to Armand and Horsepen Bayous. Defendant's failure to obtain a permit to discharge deprives Plaintiff of information regarding the ongoing dredge and fill activities, the water quality of the wetland and consequently the water quality of downstream Armand and Horsepen Bayous and Galveston Bay. As a result of Defendants' violations, Plaintiff is deprived of information necessary to properly serve its members. Without information regarding Defendants' discharges, Plaintiff cannot take appropriate action to improve the water quality of the wetland and the downstream waters. Plaintiff's efforts to educate and advocate for greater environmental protection for the benefit of Plaintiff's members is therefore obstructed.

22. The instant action would redress the harms faced by Plaintiff and its members by stopping the continued discharge complained of here and requiring the removal of illegally disposed fill materials.

23. The instant action would result in civil penalties that would deter future violations that would threaten Plaintiff's and its members' use and enjoyment of the waters adjacent to, upstream and downstream from (including Horsepen and Armand Bayous) the locations where Defendants' violations have occurred.

24. These actual, concrete injuries suffered by Baykeeper and its members are fairly traceable to Defendants' violations and are redressable by this court. Baykeeper has no other adequate remedy at law.

## THE WATER-QUALITY ROLE OF PRAIRIE POTHOLES

25. At issue in this case are coastal prairie wetlands ("prairie potholes" or "wetlands.") These wetlands have unidirectional, and possibly bidirectional, hydrologic and biologic exchanges with waters of the United States. Those waters of the United States, in this case, are Horsepen Bayou and Armand Bayou. The numerous prairie potholes at the Development Site are hydrologically and physically connected to Armand and Horsepen Bayous.

26. Prairie potholes perform a water storage function, and this can lessen downgradient flooding of, and, thus, sediment deposition in downstream waters of the United States. They also act as cleansing "sinks" and transformers of various water-borne and atmospheric pollutants, especially, nutrients like nitrogen and phosphorus. Studies have found that prairie potholes very similar to the ones at issue in this case retain over 90% of atmospheric nitrogen and phosphorus (*i.e.* anthropogenic nutrient sources from developed areas and delivered to the prairie potholes via precipitation). To the extent prairie potholes are altered in ways that lessen their retention and transformation capabilities, these pollutants will not be retained, will be discharged,

7

and will degrade the quality of downstream waters of the United States. These prairie potholes at the Development Site are thus chemically connected to waters of the United States.

27. The Prairie potholes at the Development Site also have biological connectivity with waters of the United States (a) through the movement of amphibians, aquatic seeds, macroinvertebrates, reptiles and mammals between the two and (b) by supplying sources of food and genetic diversity for biota and invertebrates. These biological communities, in turn, help maintain the quality of waters of the United States.

28. The prairie potholes on the Development Site are located within the 500-year floodplain of Armand and Horsepen Bayous and Galveston Bay.

## LEGAL BACKGROUND

**The Clean Water Act**

29. Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In doing so, Congress' stated goal was to eliminate discharges of pollutants – including rock, fill, and dredged material – to navigable waters by 1985.

30. To achieve this goal, § 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the point source discharge of any pollutant by any person to navigable waters of the United States unless the discharge is in compliance with a permit issued pursuant to relevant sections of the Clean Water Act, including Section 404, 33 U.S.C. § 1344.

31. The "discharge of a pollutant" means "any addition of any pollutant" to waters of the United States from "any point source." 33 U.S.C. § 1367(12); 40 C.F.R. § 122.2.

8

32. A "pollutant" is defined to include, among other things, "dredged spoil, solid waste, biological materials, . . . rock, [and] sand." 33 U.S.C. § 1362(6).

33. The term "navigable waters" means the waters of the United States, 33 U.S.C. § 1362(7).

34. "Waters of the United States" are defined as all interstate waters; as well all other waters "such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, 'wetlands,' sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce" as well as all intrastate lakes, rivers, streams (including intermittent streams), wetlands, sloughs, and prairie potholes. 40 C.F.R. § 122.2.

35. "Waters of the United States" include wetlands that are adjacent to or have a significant nexus to waters of the United States. A significant nexus exists "if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Rapanos v. United States*, 547 U.S. 715, 780 (2006).

36. The term "navigable waters" means waters of the United States, including the territorial seas. 33 U.S.C. § 1362 (7).

37. The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, landfill

9

leachate collection system, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); 40 C.F.R. § 122.2.

**Discharge of Dredged or Fill Material**

38. The Clean Water Act prohibits the discharge of dredged or fill material to waters of the United States without a permit, 33 U.S.C. § 1344; 33 C.F.R. § 323.3(a).

39. "Discharge of dredged material" is defined as "any addition of dredged material into, including redeposit of dredged material other than incidental fallback within, the waters of the United States." 33 C.F.R. § 323.2(d). This includes any addition or redeposit of dredged material that is incidental to any activity including mechanized land clearing, ditching, channelization, or other excavation.

40. "Discharge of fill material" means the addition of fill material into the waters of the United States. 33 C.F.R. § 323.2(f).

41. The term "fill material" means material placed in waters of the United States where the material has the effect of replacing any portion of the water of the United States with dry land or changing the bottom elevation of any portion of a water of the United States. 33 C.F.R. § 323.2(e)(1).

42. "Fill material" includes rock, sand, coil, clay, plastics, construction debris, wood chips, and other materials used to create any structure or infrastructure in the waters of the United States. 33 C.F.R. § 323.2(e)(2).

43. Section 404 of the Clean Water Act, 33 U.S.C. § 1344, authorizes the Secretary of the Army to issue permits for the discharge of dredged or fill material into "navigable waters," including wetlands with a significant nexus to navigable waters. The Section

404 permitting program is administered by the Army Corps of Engineers ("Corps"). Unless exempted by Section 404(f)(1) under circumstances not relevant to this action, all discharges of dredged or fill material into waters of the United States must be authorized under a Section 404 permit issued by the Corps.

44. In reviewing a Section 404 permit application, the Corps must complete a "Public Interest Review" and follow rules developed by EPA under Section 404(b) of the Clean Water Act, 33 U.S.C. § 1344(b), which are known as the "404(b)(1) Guidelines." 33 C.F.R. § 320.4(a).

45. The Public Interest Review is a balancing test in which the Corps considers a number of factors including economics, fish and wildlife values, water quality, scenic and recreational values, safety, and public needs and welfare in general. 33 C.F.R. § 320.4(a).

46. Recognizing the unique value of wetlands, the 404(b)(1) Guidelines governing disposal of dredged and fill materials note that "the degradation or destruction of special aquatic sites, such as filling operations in wetlands, is considered to be among the most severe environmental impacts covered by these Guidelines. The guiding principle should be that degradation or destruction of special sites may represent an irreversible loss of valuable aquatic resources." 40 C.F.R. § 230.1(d).

47. The 404(b)(1) Guidelines are codified at 40 C.F.R. pt. 230. The Corps is prohibited from issuing any permit if:
    a. There is a practicable alternative to the proposed discharge that would have less adverse effect on the aquatic ecosystem, so long as such alternative does not have other significant adverse environmental consequences; or

11

    b. The proposed discharge will result in significant degradation of the aquatic ecosystem . . . ; or

    c. The proposed discharge does not include all appropriate and practicable measures to minimize the potential harm to the aquatic ecosystem; or

    d. There does not exist sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with the Guidelines.

40 C.F.R. § 230.12(a)(3).

48. Permits issued pursuant to Section 404 of the Clean Water Act may include special conditions in order to satisfy legal requirements or otherwise satisfy the public interest requirement. 33 C.F.R. § 325.4.

49. Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the point source discharge of pollutants to waters of the United States unless the discharge is in compliance with a permit issued pursuant to Section 402 or Section 404 of the CWA, 33 U.S.C. §§ 1342 and 1344.

**Citizen Enforcement**

50. Clean Water Act violations are subject to enforcement actions initiated by EPA, states, and citizens. 33 U.S.C. §§ 1319, 1365. Citizens are required to provide sixty days' notice of any alleged violations prior to commencing suits. 33 U.S.C. § 1365(b). After sixty days have passed, citizens may bring an action in federal district court to enforce any ongoing violations of the Clean Water Act.

51. Section 505(a) of the Clean Water Act authorizes citizens to bring suit against any person who is alleged to be in violation of an effluent standard or limitation under the Clean Water Act. 33 U.S.C. § 1365(a). Effluent limitation is broadly defined as "an

unlawful act under subsection 1311 of this title," which includes the unpermitted discharge of dredged or fill material into navigable waters. 33 U.S.C. § 1365(f).

## FACTS

52. Defendants' actions on its property thus far include the commencement of development activities, such as bulldozing and the clearing of vegetation, leading to the discharge of fill material into jurisdictional wetlands with a significant nexus to Armand and Horsepen Bayous. Defendant's actions were undertaken without the required permit as specified by the CWA, and therefore are in violation of federal law.

53. Prairie pothole wetlands located on Defendants' property at the intersection of El Dorado and Space Center Boulevard cover at least 25% of the Defendants' planned Development Site. The wetlands belong to a group of depressional wetlands located on the Pleistocene Texas Gulf Coastal Plain that are linked by episodic-flowing swales. These wetlands collect a significant percentage of the precipitation falling on the land surrounding Galveston Bay and Armand and Horsepen Bayous and collectively function as a pollution sink which retains nutrient pollutants, playing a critical role in maintaining the water quality and environmental integrity of Armand and Horsepen Bayous, as well as of Galveston Bay.

54. The prairie pothole wetlands at the Development Site are located approximately one-half mile from Horsepen Bayou and one mile from Armand Bayou.

55. The prairie pothole wetlands located at the Development Site are hydrologically connected to Armand and Horsepen Bayous, which are waters of the United States.

56. A significant physical, chemical, and biological nexus exists between the prairie pothole wetlands located at the Development Site and Armand and Horsepen Bayous, which are waters of the United States.

57. Armand Bayou is an estuarine bayou that flows into Galveston Bay. The freshwater in Armand Bayou originates as runoff from precipitation falling on approximately 64 square miles of land surrounding Armand Bayou. The public, largely through the efforts of the Armand Bayou Nature Center, uses the Bayou for canoeing, hiking, photography, fishing, boating tours, and wildlife observation. The Bayou is home to more than 370 species of birds, mammals, reptiles, and amphibians, including white-tailed deer, armadillo, swamp rabbits, bobcats, coyotes, turtles, alligators, frogs, and venomous and non-venomous snakes.

58. Horsepen Bayou originates northwest of Armand Bayou and runs east from southeastern Harris County for five miles to its confluence with Armand Bayou. Like Armand Bayou, Horsepen Bayou lies in an increasingly rare biological transition zone between the coastal prairie and the coastal salt marshes. Thus, the public possesses similar recreational, aesthetic, and ecological interests in the continued preservation of the Bayou. Moreover, Horsepen Bayou is one of the few locations where alligators in excess of 10 feet can be observed.

59. The Galveston Bay watershed encompasses 24,000 square miles of land and nearly half of the population of Texas. It contains an estimated 120,000 acres of wetlands. The Bay is one of the top locations for birding in the United States and supports other recreational activities like boating, biking, fishing, swimming, and surfing. Moreover,

the Bay's ecosystem sustains the commercial fishing industry and seafood harvesting along the Gulf Coast.

60. As of November 8, 2013, Defendants commenced land clearing and fill development activities, such as bulldozing and clearing vegetation, on its property at the intersection of El Dorado and Space Center Boulevard.

61. Defendants have discharged, or have caused to be discharged, and continue to discharge soil, rock and/or other fill material into wetlands located on the Development Site.

62. As a result of Defendants' clearing activities, the discharged fill material covered portions of the wetland substrate and vegetation, altering the bottom elevation of the wetland.

63. The wetlands connected to Armand and Horsepen Bayous covers a significant percentage of Trendmaker's planned development site. Of the 412.3 acres that Trendmaker plans to develop, at least 200 acres are depressional wetlands.

64. Defendants did not obtain a permit authorizing the discharge of dredge or fill material into waters of the United States under the CWA.

65. Defendants' discharge of fill material contributes pollutants to waters of the United States, including Armand and Horsepen Bayous and Galveston Bay. The discharges from Defendants' construction, thereby, injure Plaintiff and Plaintiff's members.

66. Armand and Horsepen Bayous are used by Texas citizens and visitors, as well as by Plaintiff's members for recreational activities, including canoeing, hiking, fishing, birdwatching, photography, and nature watching. The enjoyment of these activities and waters by Plaintiff's members is diminished by Defendant's pollutant discharges

into Armand and Horsepen Bayous and the Bay. Defendants' failure to report or mitigate its adverse impact on the waters of the United States (as it would be required to do under a 404 Permit) harms Plaintiff.

67. Defendants have violated § 301 of the Clean Water Act, 33 U.S.C. § 1311, by discharging fill material into the wetland without a permit. Consequently, Plaintiff has expended costs and obtained the services of attorneys to prosecute this action. Plaintiff is entitled to recover its costs including its reasonable attorney and expert witness fees as provided for under the CWA, 33 U.S.C. § 1365(d).

## CLAIM FOR RELIEF

### Failure to Obtain Permit to Discharge Dredged and Fill Material

### (Violations of 33 U.S.C. Section 1311(a))

68. Plaintiff incorporates each and every allegation set forth above.

69. Defendants' discharge of dredged and fill material into the wetlands on its site without a Clean Water Act Section 404 permit constitutes a violation of Sections 301(a) and 404 of the Clean Water Act, 33 U.S.C. § 1311(a) and 1344, and a violation of "effluent standard(s) or limitation(s)" as this term is used in Section 505 of the Clean Water Act, 33 U.S.C. § 1365.

70. As defined by the CWA, Defendants are "persons" responsible for discharging "pollutants" from a "point source" into the "waters of the United States" in violation of the CWA because Defendants lack permit authority for such discharges as required by 301(a) of the CWA.

71. Defendants' violations have been occurring regularly and consistently since at least November 2013 and are continuing to occur through the date of this Complaint.

72. Each day in which the dredged or fill material remains in waters of the United States constitutes a separate violation of the Clean Water Act.

73. Defendants have benefited and will continue to benefit economically as a consequence of its violations and its failure to implement improvements to its operations and its failure to fully mitigate the harms of its actions.

74. The violations committed by Defendants are ongoing and there is more than a reasonable likelihood that they will recur and a realistic prospect they will continue absent redress from this Court.

75. Without the imposition of appropriate civil penalties and the issuance of an injunction, Defendants are likely to continue to violate the Clean Water Act by contributing to the destruction of a federally protected wetland, which will result in the further injury of the Plaintiff, its members, and others.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

A. Declare that Defendants have violated and continues to violate Sections 301(a) and 404 of the Clean Water Act, 33 U.S.C. §§ 1311(a), 1344;

B. Enjoin Defendants from further violations of the Clean Water Act, including enjoining Defendants from performing any further activity at the Development Site before obtaining the necessary authorization from the U.S. Army Corps of Engineers;

C. Order Defendants to take specific actions to remediate and/or mitigate the environmental harm caused by its violations;

D. Retain jurisdiction over this matter until such time as Defendants have come into compliance with the prohibitions, terms, and conditions of the Clean and Water Act and the injunctive relief ordered by this Court;

E. Order Defendants to pay all appropriate civil penalties of up $37,500 per day for each day of each violation of the Clean Water Act, as provided by 33 U.S.C. § 1319(d) and 1365(a), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. pt. 19;

F. Award Plaintiff its litigation expenses, including reasonable attorney fees and expert witness fees, as authorized under the Clean Water Act. 33 U.S.C. § 1365(d); and

G. Grant such further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 30th day of May, 2014.

By:   /s/  David Frederick

David Frederick
Frederick, Perales, Allmon & Rockwell, P.C.
Texas Bar # 07412300
Southern District Bar # 154115
707 Rio Grande, Ste. 200
Austin, Texas 78701
Tel: (512) 469 – 6000
Fax: (512) 482 – 9346
dof@lf-lawfirm.com

Attorney-in-charge for Galveston Baykeeper