IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS,
HOUSTON DIVISION

| | | |
|---|---|---|
| GALVESTON BAYKEEPER, INC., | § | |
| | § | |
| Plaintiff, | § | Civil Cause No.: |
| vs. | § | |
| | § | 4:14-CV-01500 |
| TRENDMAKER HOMES, INC., a Texas corporation, | § | |
| and TRENDMAKER CLEAR LAKE, LLC, a Texas | § | |
| limited liability company, | § | |
| | § | |
| Defendants. | § | |

## SECOND AMENDED COMPLAINT

### INTRODUCTION

1. Plaintiff Galveston Baykeeper ("Baykeeper") brings this citizen suit under § 505(a)(1) of the Clean Water Act, 33 U.S.C. §1365(a)(1). Baykeeper seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorneys' and expert witness fees, for Defendant Trendmaker Homes, Inc.'s, and Trendmaker Clear Lake, LLC's, (collectively "Trendmaker" or "Defendants") repeated, ongoing and continuing violations of Sections 301(a) and 404 of the Federal Water Pollution Control Act also known as the Clean Water Act (hereinafter "Clean Water Act" or "CWA"), 33 U.S.C. §§ 1311(a) and 1344, for the unpermitted discharge of dredged and/or fill material into the waters of the United States in violation of section 404 of the Clean Water Act, 33 U.S.C. § 1344, which is occurring as a result of Defendants' residential subdivision development in Clear Lake ("Development Site").

2.  In this action, Plaintiff sues to enjoin further wetland destruction until Defendants obtain a § 404 permit. Plaintiff's members regularly visit the wetlands and open waters that are supported by wetlands Defendants have filled, and Plaintiff's members have an interest in preserving the vital functions those wetlands perform in connection with Armand and Horsepen Bayous, as well as with Galveston Bay. Plaintiff seeks to ensure that the proper wetland-loss procedures are followed so that the ecological health of the watershed is protected.

3.  Defendants have discharged and are continuing to discharge dirt, soil, clay and dredged material into waters of the United States.

4.  Defendants have neither sought nor received the required CWA permit for their dredge and fill activities.

5.  Defendants' ongoing violations of the CWA have caused, and will continue to cause, unless abated, significant damage to the coastal prairie wetland ecosystem that Plaintiff's members use and enjoy.

## JURISDICTION AND VENUE

6.  Jurisdiction over this action is conferred by 28 U.S.C § 1331 (federal question) and 33 U.S.C. § 1365(a) (Clean Water Act citizens suit provision).  This Court has subject matter jurisdiction over the claims specified in the Complaint under 33 U.S.C. § 1365(a).  An actual, justiciable controversy exists between Plaintiff and Defendants. The requested relief is proper under 28 U.S.C. §§ 2201 and 2202.

7.  Venue is appropriate in this District pursuant to 33 U.S.C. § 1365(c) because the source of all of the Clean Water Act violations complained of is located in Harris County, Texas, and within the Southern District of Texas.

## NOTICE

8.  By letter postmarked on November 27, 2013, pursuant to 33 U.S.C. § 1365(b)(1)(A), Plaintiff notified Defendant Trendmaker Homes, Inc., its registered agent, Defendant Trendmaker Clear Lake LLC (via Trendmaker Homes, Inc.), the United States Environmental Protection Agency ("EPA"), and the Texas Commission on Environmental Quality ("TCEQ") of Defendants' CWA violations and of Plaintiff's intent to sue Defendants under the Clean Water Act and all parties received this Notice.  A true copy of the notice letter is attached to this complaint as Exhibit 1.  The allegations in the notice letter are incorporated herein by this reference.

9.  More than sixty days have passed since notice was served, and the violations complained of in the notice letter are continuing and are reasonably likely to continue to occur.  Defendants are in violation of the CWA.

10. Neither EPA nor the State of Texas has commenced and diligently prosecuted an action that would preclude this action under either 33 U.S.C. §§ 1319(g)(6) or 1365(b)(1)(B).

## PARTIES

11. Defendant Trendmaker Homes, Inc. is a home-construction company and a domestic business corporation conducting business in the State of Texas.  Trendmaker Homes, Inc. has offices at 16340 Park Ten Place, Suite 250, Houston, Texas 77084.

12. Defendant Trendmaker Clear Lake, LLC is a limited liability company created by Trendmaker Homes, Inc. for the sole purpose of developing the Clear Lake

subdivision.  Both Trendmaker Homes, Inc. and Trendmaker Clear Lake, LLC share the same registered agent.

13. At all relevant times, Defendants have owned a portion of land east of Space Center Boulevard and to the west of Red Bluff Road, at the intersection of El Dorado and Space Center Boulevard in Harris County, Texas.

14. Defendants' actions on its property thus far include the commencement of development activities, such as bulldozing and the clearing of vegetation, leading to the discharge of fill material into jurisdictional wetlands with a significant nexus to Armand and Horsepen Bayous. Defendants' actions were undertaken without the required permit as specified by the CWA, and therefore are in violation of federal law.

15. Plaintiff Galveston Baykeeper ("Baykeeper") is suing on behalf of its members. Baykeeper is a nonprofit public benefit conservation organization incorporated in the State of Texas. Its principal place of business is in Seabrook, Texas and Baykeeper has approximately 500 members. Baykeeper is a membership organization and has members who are injured by Defendants' violations.

16. Baykeeper is a non-profit "501(c)(3)" conservation organization.  Baykeeper is a grassroots organization committed to preserving and protecting the health of Galveston Bay and its watershed for our children and their progeny, their economy and their future through advocacy and education and enforcement of the CWA.

17. Baykeeper has members who regularly use and enjoy the waters in and around Armand and Horsepen Bayous, including the waters affected by the violations at issue in this case. Baykeeper's members engage in outdoor recreation like canoeing,

hiking, fishing, birdwatching, and photography, as well as other recreational, educational, environmental, scientific, and vocational activities of interest near this wetland and in Armand and Horsepen Bayous. Baykeeper members regularly provide eco-tours of Armand Bayou on pontoon boats operated by the Armand Bayou Nature Center and have done so for years.  Baykeeper members plan to continue to use and enjoy these areas and waterways for recreational, vocational, educational, and environmental purposes in the future and have specific and near-term plans to return to use such waters for the uses described above in the spring and summer of 2014.

18. The dredging and filling activities and the pollutants discharged by Defendants negatively affect aquatic habitat values for fish and other aquatic wildlife and birds, decrease populations of these species and therefore decrease Plaintiff's members' ability to successfully fish, observe fish, bird watch, and recreate both in the area adjacent to the discharges as well as upstream and downstream areas such as Armand Bayou and Horsepen Bayou that are ecologically and hydrologically connected to the areas most directly affected by Defendants' discharges.

19. Ongoing pollution from Defendants also deters Galveston Baykeepers' members from using and enjoying such waters as they otherwise would because of reasonable and scientifically-based concerns about the adverse effects of Defendants' discharges and dredge and fill activities.

20. [Paragraph intentionally omitted.]

21.  [Paragraph intentionally omitted.]

22. The instant action would redress the harms faced by Plaintiff's members by stopping the continued discharge complained of here and requiring the removal of illegally disposed fill materials.

23. The instant action would result in civil penalties that would deter future violations that would threaten Plaintiff's members' use and enjoyment of the waters adjacent to, upstream and downstream from (including Horsepen and Armand Bayous) the locations where Defendants' violations have occurred.

24. These actual, concrete injuries suffered by Baykeeper's members are fairly traceable to Defendants' violations and are redressable by this court. Baykeeper has no other adequate remedy at law.

## THE WATER-QUALITY ROLE OF PRAIRIE POTHOLES

25. At issue in this case are coastal prairie wetlands ("prairie potholes" or "wetlands.") These wetlands have unidirectional, and possibly bidirectional, hydrologic and biologic exchanges with waters of the United States.  Those waters of the United States, in this case, are Horsepen Bayou and Armand Bayou.  The numerous prairie potholes at the Development Site are hydrologically and physically connected to Armand and Horsepen Bayous.

26. Prairie potholes perform a water storage function, and this can lessen downgradient flooding of, and, thus, sediment deposition in downstream waters of the United States.  They also act as cleansing "sinks" and transformers of various water-borne and atmospheric pollutants, especially, nutrients like nitrogen and phosphorus. Studies have found that prairie potholes very similar to the ones at issue in this case retain over 90% of atmospheric nitrogen and phosphorus (*i.e.* anthropogenic nutrient

sources from developed areas and delivered to the prairie potholes via precipitation). To the extent prairie potholes are altered in ways that lessen their retention and transformation capabilities, these pollutants will not be retained, will be discharged, and will degrade the quality of downstream waters of the United States. These prairie potholes at the Development Site are thus chemically connected to waters of the United States.

27. The Prairie potholes at the Development Site also have biological connectivity with waters of the United States (a) through the movement of amphibians, aquatic seeds, macroinvertebrates, reptiles and mammals between the two and (b) by supplying sources of food and genetic diversity for biota and invertebrates. These biological communities, in turn, help maintain the quality of waters of the United States.

28. The prairie potholes on the Development Site are located within the 500-year floodplain of Armand and Horsepen Bayous and Galveston Bay.

## LEGAL BACKGROUND

**The Clean Water Act**

29. Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In doing so, Congress' stated goal was to eliminate discharges of pollutants – including rock, fill, and dredged material – to navigable waters by 1985.

30. To achieve this goal, § 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the point source discharge of any pollutant by any person to navigable waters of the United States unless the discharge is in compliance with a permit issued pursuant to relevant sections of the Clean Water Act, including Section 404, 33 U.S.C. § 1344.

31. The "discharge of a pollutant" means "any addition of any pollutant" to waters of the United States from "any point source." 33 U.S.C. § 1367(12); 40 C.F.R. § 122.2.

32. A "pollutant" is defined to include, among other things, "dredged spoil, solid waste, biological materials, . . . rock, [and] sand." 33 U.S.C. § 1362(6).

33. The term "navigable waters" means the waters of the United States, 33 U.S.C. § 1362(7).

34. "Waters of the United States" are defined as all interstate waters; as well all other waters "such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, 'wetlands,' sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce" as well as all intrastate lakes, rivers, streams (including intermittent streams), wetlands, sloughs, and prairie potholes.  40 C.F.R. § 122.2.

35. "Waters of the United States" include wetlands that are adjacent to or have a significant nexus to waters of the United States. A significant nexus exists "if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Rapanos v. United States*, 547 U.S. 715, 780 (2006).

36. The term "navigable waters" means waters of the United States, including the territorial seas.  33 U.S.C. § 1362 (7).

37. The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete

fissure, container, rolling stock, concentrated animal feeding operation, landfill leachate collection system, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); 40 C.F.R. § 122.2.

**Discharge of Dredged or Fill Material**

38. The Clean Water Act prohibits the discharge of dredged or fill material to waters of the United States without a permit, 33 U.S.C. § 1344; 33 C.F.R. § 323.3(a).

39. "Discharge of dredged material" is defined as "any addition of dredged material into, including redeposit of dredged material other than incidental fallback within, the waters of the United States." 33 C.F.R. § 323.2(d). This includes any addition or redeposit of dredged material that is incidental to any activity including mechanized land clearing, ditching, channelization, or other excavation.

40. "Discharge of fill material" means the addition of fill material into the waters of the United States. 33 C.F.R. § 323.2(f).

41. The term "fill material" means material placed in waters of the United States where the material has the effect of replacing any portion of the water of the United States with dry land or changing the bottom elevation of any portion of a water of the United States. 33 C.F.R. § 323.2(e)(1).

42. "Fill material" includes rock, sand, coil, clay, plastics, construction debris, wood chips, and other materials used to create any structure or infrastructure in the waters of the United States. 33 C.F.R. § 323.2(e)(2).

43. Section 404 of the Clean Water Act, 33 U.S.C. § 1344, authorizes the Secretary of the Army to issue permits for the discharge of dredged or fill material into "navigable

waters," including wetlands with a significant nexus to navigable waters. The Section 404 permitting program is administered by the Army Corps of Engineers ("Corps"). Unless exempted by Section 404(f)(1) under circumstances not relevant to this action, all discharges of dredged or fill material into waters of the United States must be authorized under a Section 404 permit issued by the Corps.

44. In reviewing a Section 404 permit application, the Corps must complete a "Public Interest Review" and follow rules developed by EPA under Section 404(b) of the Clean Water Act, 33 U.S.C. § 1344(b), which are known as the "404(b)(1) Guidelines." 33 C.F.R. § 320.4(a).

45. The Public Interest Review is a balancing test in which the Corps considers a number of factors including economics, fish and wildlife values, water quality, scenic and recreational values, safety, and public needs and welfare in general. 33 C.F.R. § 320.4(a).

46. Recognizing the unique value of wetlands, the 404(b)(1) Guidelines governing disposal of dredged and fill materials note that "the degradation or destruction of special aquatic sites, such as filling operations in wetlands, is considered to be among the most severe environmental impacts covered by these Guidelines. The guiding principle should be that degradation or destruction of special sites may represent an irreversible loss of valuable aquatic resources." 40 C.F.R. § 230.1(d).

47. The 404(b)(1) Guidelines are codified at 40 C.F.R. pt. 230. The Corps is prohibited from issuing any permit if:

a. There is a practicable alternative to the proposed discharge that would have less adverse effect on the aquatic ecosystem, so long as such alternative does not have other significant adverse environmental consequences; or

b. The proposed discharge will result in significant degradation of the aquatic ecosystem . . . ; or

c. The proposed discharge does not include all appropriate and practicable measures to minimize the potential harm to the aquatic ecosystem; or

d. There does not exist sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with the Guidelines.

40 C.F.R. § 230.12(a)(3).

48. Permits issued pursuant to Section 404 of the Clean Water Act may include special conditions in order to satisfy legal requirements or otherwise satisfy the public interest requirement. 33 C.F.R. § 325.4.

49. Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the point source discharge of pollutants to waters of the United States unless the discharge is in compliance with a permit issued pursuant to Section 402 or Section 404 of the CWA, 33 U.S.C. §§ 1342 and 1344.

**Citizen Enforcement**

50. Clean Water Act violations are subject to enforcement actions initiated by EPA, states, and citizens. 33 U.S.C. §§ 1319, 1365. Citizens are required to provide sixty days' notice of any alleged violations prior to commencing suits. 33 U.S.C. § 1365(b). After sixty days have passed, citizens may bring an action in federal district court to enforce any ongoing violations of the Clean Water Act.

51. Section 505(a) of the Clean Water Act authorizes citizens to bring suit against any person who is alleged to be in violation of an effluent standard or limitation under the Clean Water Act. 33 U.S.C. § 1365(a). Effluent limitation is broadly defined as "an unlawful act under subsection 1311 of this title," which includes the unpermitted discharge of dredged or fill material into navigable waters. 33 U.S.C. § 1365(f).

**FACTS**

52. Defendants' actions on its property thus far include the commencement of development activities, such as bulldozing and the clearing of vegetation, leading to the discharge of fill material into jurisdictional wetlands with a significant nexus to Armand and Horsepen Bayous. Defendant's actions were undertaken without the required permit as specified by the CWA, and therefore are in violation of federal law.

53. Prairie pothole wetlands located on Defendants' property at the intersection of El Dorado and Space Center Boulevard cover at least 25% of the Defendants' planned Development Site. The wetlands belong to a group of depressional wetlands located on the Pleistocene Texas Gulf Coastal Plain that are linked by episodic-flowing swales. These wetlands collect a significant percentage of the precipitation falling on the land surrounding Galveston Bay and Armand and Horsepen Bayous and collectively function as a pollution sink which retains nutrient pollutants, playing a critical role in maintaining the water quality and environmental integrity of Armand and Horsepen Bayous, as well as of Galveston Bay.

54. The prairie pothole wetlands at the Development Site are located approximately one-half mile from Horsepen Bayou and one mile from Armand Bayou.

12

55. The prairie pothole wetlands located at the Development Site are hydrologically connected to Armand and Horsepen Bayous, which are waters of the United States.

56. A significant physical, chemical, and biological nexus exists between the prairie pothole wetlands located at the Development Site and Armand and Horsepen Bayous, which are waters of the United States.

57. Armand Bayou is an estuarine bayou that flows into Galveston Bay. The freshwater in Armand Bayou originates as runoff from precipitation falling on approximately 64 square miles of land surrounding Armand Bayou. The public, largely through the efforts of the Armand Bayou Nature Center, uses the Bayou for canoeing, hiking, photography, fishing, boating tours, and wildlife observation. The Bayou is home to more than 370 species of birds, mammals, reptiles, and amphibians, including white-tailed deer, armadillo, swamp rabbits, bobcats, coyotes, turtles, alligators, frogs, and venomous and non-venomous snakes.

58. Horsepen Bayou originates northwest of Armand Bayou and runs east from southeastern Harris County for five miles to its confluence with Armand Bayou. Like Armand Bayou, Horsepen Bayou lies in an increasingly rare biological transition zone between the coastal prairie and the coastal salt marshes. Thus, the public possesses similar recreational, aesthetic, and ecological interests in the continued preservation of the Bayou. Moreover, Horsepen Bayou is one of the few locations where alligators in excess of 10 feet can be observed.

59. The Galveston Bay watershed encompasses 24,000 square miles of land and nearly half of the population of Texas. It contains an estimated 120,000 acres of wetlands. The Bay is one of the top locations for birding in the United States and supports other

13

recreational activities like boating, biking, fishing, swimming, and surfing. Moreover, the Bay's ecosystem sustains the commercial fishing industry and seafood harvesting along the Gulf Coast.

60. As of November 8, 2013, Defendants commenced land clearing and fill development activities, such as bulldozing and clearing vegetation, on its property at the intersection of El Dorado and Space Center Boulevard.

61. Defendants have discharged, or have caused to be discharged, and continue to discharge soil, rock and/or other fill material into wetlands located on the Development Site.

62. As a result of Defendants' clearing activities, the discharged fill material covered portions of the wetland substrate and vegetation, altering the bottom elevation of the wetland.

63. The wetlands connected to Armand and Horsepen Bayous covers a significant percentage of Trendmaker's planned development site. Of the 412.3 acres that Trendmaker plans to develop, at least 200 acres are depressional wetlands.

64. Defendants did not obtain a permit authorizing the discharge of dredge or fill material into waters of the United States under the CWA.

65. Defendants' discharge of fill material contributes pollutants to waters of the United States, including Armand and Horsepen Bayous and Galveston Bay. The discharges from Defendants' construction, thereby, injure Plaintiff's members.

66. Armand and Horsepen Bayous are used by Texas citizens and visitors, as well as by Plaintiff's members for recreational activities, including canoeing, hiking, fishing, birdwatching, photography, and nature watching. The enjoyment of these activities

and waters by Plaintiff's members is diminished by Defendant's pollutant discharges into Armand and Horsepen Bayous and the Bay.  Defendants' failure to report or mitigate its adverse impact on the waters of the United States (as it would be required to do under a 404 Permit) harms Plaintiff's members.

67. Defendants have violated § 301 of the Clean Water Act, 33 U.S.C. § 1311, by discharging fill material into the wetland without a permit. Consequently, Plaintiff has expended costs and obtained the services of attorneys to prosecute this action. Plaintiff is entitled to recover its costs including its reasonable attorney and expert witness fees as provided for under the CWA, 33 U.S.C. § 1365(d).

## CLAIM FOR RELIEF

### Failure to Obtain Permit to Discharge Dredged and Fill Material

### (Violations of 33 U.S.C. Section 1311(a))

68. Plaintiff incorporates each and every allegation set forth above.

69. Defendants' discharge of dredged and fill material into the wetlands on its site without a Clean Water Act Section 404 permit constitutes a violation of Sections 301(a) and 404 of the Clean Water Act, 33 U.S.C. § 1311(a) and 1344, and a violation of "effluent standard(s) or limitation(s)" as this term is used in Section 505 of the Clean Water Act, 33 U.S.C. § 1365.

70. As defined by the CWA, Defendants are "persons" responsible for discharging "pollutants" from a "point source" into the "waters of the United States" in violation of the CWA because Defendants lack permit authority for such discharges as required by 301(a) of the CWA.

71. Defendants' violations have been occurring regularly and consistently since at least

November 2013 and are continuing to occur through the date of this Complaint.

72. Each day in which the dredged or fill material remains in waters of the United States constitutes a separate violation of the Clean Water Act.

73. Defendants have benefited and will continue to benefit economically as a consequence of its violations and its failure to implement improvements to its operations and its failure to fully mitigate the harms of its actions.

74. The violations committed by Defendants are ongoing and there is more than a reasonable likelihood that they will recur and a realistic prospect they will continue absent redress from this Court.

75. Without the imposition of appropriate civil penalties and the issuance of an injunction, Defendants are likely to continue to violate the Clean Water Act by contributing to the destruction of a federally protected wetland, which will result in the further injury of the Plaintiff's members and others.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

A. Declare that Defendants have violated and continues to violate Sections 301(a) and 404 of the Clean Water Act, 33 U.S.C. §§ 1311(a), 1344;

B. Enjoin Defendants from further violations of the Clean Water Act, including enjoining Defendants from performing any further activity at the Development Site before obtaining the necessary authorization from the U.S. Army Corps of Engineers;

C. Order Defendants to take specific actions to remediate and/or mitigate the environmental harm caused by its violations;

D.  Retain jurisdiction over this matter until such time as Defendants have come into compliance with the prohibitions, terms, and conditions of the Clean and Water Act and the injunctive relief ordered by this Court;

E.  Order Defendants to pay all appropriate civil penalties of up $37,500 per day for each day of each violation of the Clean Water Act, as provided by 33 U.S.C. § 1319(d) and 1365(a), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. pt. 19;

F.  Award Plaintiff its litigation expenses, including reasonable attorney fees and expert witness fees, as authorized under the Clean Water Act. 33 U.S.C. § 1365(d); and

G.  Grant such further relief as the Court deems just and proper.


RESPECTFULLY SUBMITTED this 22nd of September, 2014.


By:    /s/  David Frederick

David Frederick
Frederick, Perales, Allmon & Rockwell, P.C.
Texas Bar # 07412300
Southern District Bar # 154115
707 Rio Grande, Ste. 200
Austin, Texas 78701
Tel: (512) 469 – 6000
Fax: (512) 482 – 9346
dof@lf-lawfirm.com

Attorney-in-charge for Galveston Baykeeper

## CERTIFICATE OF SERVICE

I hereby certify that on September 22, 2014, all counsel of record who are deemed to have consented to electronic service have been served with a copy of the foregoing instrument via the Court's CM/ECF System for filing.


  /s/  David Frederick
     

David Frederick

# Exhibit 1 to Plaintiff's Complaint

LOWERRE, FREDERICK, PERALES,
ALLMON & ROCKWELL
ATTORNEYS AT LAW
707 Rio Grande, Suite 200
Austin, Texas 78701
(512) 469-6000 • (512) 482-9346 (facsimile)
Mail@LF-LawFirm.com

November 27, 2013

*Via U.S. Certified Mail/RRR:*
Will Holder, President
Trendmaker Homes
16340 Park Ten Place, Suite 250
Houston, Texas 77084

*Via U.S. Certified Mail/RRR:*
National Registered Agent, Inc.
Registered Agent for Trendmaker Homes
350 N. St. Paul Steet, Suite 2900
Dallas, Texas 75201-4234

   RE: Notice of Intent to Sue under the Clean Water Act;
      Violations by Trendmaker Homes Related to Filling of Wetlands.

Dear Mr. Holder:

  I write on behalf of Galveston Baykeeper, P. O. Box 71, Seabrook, Texas 77586 ("Baykeeper"), to provide you with sixty days' notice that Baykeeper intends to file a citizen suit in federal court against Trendmaker Homes for violations of the Clean Water Act (CWA) as authorized by §505 of the CWA, 33 U.S.C. §1365, for initiating fill activities and development activities leading to the discharge of fill material into waters of the United States without a federal permit issued by the U.S. Army Corps of Engineers under §404 of the CWA in violation of §301 of the CWA.

I.  Trendmaker Actions

  Trendmaker Homes is taking steps to construct a development in the Armand Bayou watershed in Clear Lake, Texas. The development is proposed to the east of Space Center Blvd and to the west of Red Bluff Road, at the intersection of El Dorado and Space Center Blvd. As detailed below, there are significant wetlands on the property.

  The U.S. Fish & Wildlife Service's National Wetlands Inventory, based on relatively low resolution aerial photographs from 1992 and 1993, shows wetlands covering approximately 25% of the property on which the development is to occur, or 100 acres. (Attachment A, NWI Map). Although not definitive of federal jurisdiction, the National Wetlands Inventory maps are evidence on the issue of whether or not an area is classified as a wetland under the CWA. *See Gulf Restoration Network v. Hancock Development*, 772 F. Supp. 2d 761, 771 (S.D. Miss. 2011) (citing *United States v. Wilson*, 133 F.3d 251, 254 (4th Cir. 1997)). More recently, on behalf of Galveston Baykeeper, a professional wetland scientist and geoscientist conducted an air photo interpretation of the wetlands on the Trendmaker site, based on high resolution aerial photographs from December 1944, December 1978, and February 2010.

(Attachment B, Air Photo Interpretation of Wetlands on the Trendmaker Site). Wetlands in this area can be identified on aerial photographs because of their unique shapes and because wet areas are typically much darker than surrounding well-drained areas. This new aerial photo interpretation reveals that the NWI is likely drastically underestimating the extent of wetlands on the property.

Those areas with very distinct wetland signatures in all three years of the above study were identified as areas having a *very high* probability of meeting all three wetland parameters (hydrophytic vegetation, wetland hydrology, and hydric soils). Those areas with distinct wetland signatures in any of the three years examined were considered to have a *high* probability of meeting all three requirements on the ground (Attachment B, at Figure 2). As can be seen from Attachment B, p. 6, the areas with a high or very high probability of containing wetlands comprise a significant percentage of the development site, approximately 200-300 acres, respectively. In addition, the hydric rating map for the Trendmaker site confirms that the there are hydric soils, including Addicks loam, Gessner loam, and Beaumont clay, on the site. (Attachment C, Hydric Rating by Map Unit).

The wetland area in question is the last remaining freshwater depressional wetland of this size in Southeast Harris County. It is hydrologically connected to Armand Bayou on the east and Horsepen Bayou to the southwest. The depressional wetland area serves various water quality functions, including settlement of solids and other pollutants and filtration of stormwater prior to such waters entering either Armand Bayou or Horespen Bayou, both navigable waters. This wetland area also serves as retention or attenuation of floodwaters and/or runoff storage. As such, the wetlands affect the chemical, physical, and biological integrity of navigable waters and this notice alleges a "significant nexus" between this wetland area in question and navigable waters.

Evidence exists that the discharge of dredge or fill material into this wetland has already occurred. A drainage pond study has been submitted to the Clear Lake City Water Authority to allow the wetland to be converted to drainage ponds as well as developable real estate. As of November 8, 2013, Trendmaker has commenced land clearing, fill, and development activities, including bulldozing and removing vegetation, as documented in the photos at Attachment D, Photos of Trendmaker Development. Baykeeper has inquired about the intent of Trendmaker Homes relative to a Section 404 Corps of Engineers permit application and have been informed that Trendmaker does not intend to apply for such a permit. Baykeeper has contacted the U.S. Army Corps of Engineers and has been informed that Trendmaker has neither submitted a permit application nor sought a determination of federal jurisdiction from the Corps regarding this wetland area. In short, Trendmaker intends to continue to fill these wetlands without a permit, allowing the discharge of dredge or fill material into waters of the United States in contravention of the federal CWA.

By this letter, Galveston Baykeeper is giving notice of intent to file suit in federal court to seek civil penalties, declaratory relief, and injunctive relief in order to protect these wetland areas at the close of the 60-day period. By this notice, Baykeeper is asking Trendmaker to halt any and all filling activities and other activities preparatory to filling and to seek a 404 permit from the U.S. Army Corps of Engineers, Galveston District. Should you refuse, Baykeeper intends, at the close of the 60-day period, to file a citizen suit against Trendmaker Homes under Section 505(a) of the Clean Water Act for the violations described herein. Baykeeper's suit will allege the violations described above and others identified during the pendency of the litigation.

II.    Clean Water Act

In 1972, Congress enacted the Federal Water Pollution Control Act, commonly known as the Clean Water Act ("CWA"), in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" and to eliminate the discharge of pollutants into navigable waters. 33

U.S.C. § 1251(a). In order to achieve this goal, the CWA prohibits the "discharge of any pollutant by any person" without compliance with the Act's permit procedures and other requirements. *Id.* § 1311(a).

The CWA specifically addresses activities that may result in the placement of dredged or fill materials into waters of the United States. A person wishing to discharge dredged or fill material into waters of the United States must submit an application for a permit to be issued by the U.S. Army Corps of Engineers ("Corps") under the procedures outlined in Section 404 of the CWA (a "Section 404 Permit"). *See* 33 U.S.C. § 1344; *see also* 33 C.F.R. § 323.1. The regulatory provisions of the Clean Water Act are written without regard to intentionality and make the person responsible for discharge of any prohibited fill material strictly liable. *U.S. v. Brink*, 795 F. Supp. 2d 565, 575 (S.D. Tex. 2011).

"The term dredged material means material that is excavated or dredged from waters of the United States." 33 C.F.R. § 323.2(c). The "term discharge of dredged material means any addition of dredged material into, including any redeposit of dredged material other than incidental fallback within, the waters of the United States." 33 C.F.R. § 323.2(d)(1). "Fill material" includes "material placed in waters of the United States where the material has the effect of ... Replacing any portion of a water of the United States with dry land." 33 C.F.R. § 323.2(e)(1)(i). Non exclusive examples are "rock, sand, soil, clay, plastics, construction debris, wood chips, overburden from ... excavation activities, and materials used to create any structure or infrastructure in the waters of the United States." 33 C.F.R. § 323.2(e)(2). "Discharge of fill material" means "the addition of fill material into waters of the United States." 33 C.F.R. § 323.2(f). This "generally includes, without limitation ... site development fills for recreational, industrial, commercial, residential, or other uses; ... road fills; dams and dikes; ... property protection and/or reclamation devices ... berm." *Id.* The removal of vegetation in wetlands area and the redeposit of that material has been held to constitute a "discharge" of fill material within the meaning of the CWA, subject to the permitting authority of the Corps of Engineers. *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 920-22 (5th Cir. 1983); 33 C.F.R. § 323.2(d)(1)(iii) (defining dredging to include redeposit of dredged material "incidental to any activity, including mechanized land clearing, ditching, channelization, or other excavation"). While above-ground removal of vegetation does not generally constitute dredging, the substantial disturbance of the root system or mechanized pushing, dragging, or other similar activities that redeposit fill material does. *See* 33 C.F.R. § 323.2(d)(1)(2)(ii).

The Corps' regulations define "waters of the United States" to include water "the use, degradation or destruction of which could affect interstate or foreign commerce" and wetlands adjacent to waters of the United States. 33 C.F.R. § 328.3. Pursuant to the U.S. Supreme Court's decision in *Rapanos*, and the U.S. Environmental Protection Agency and Corps guidance interpreting that decision, wetlands that constitute waters of the United States include: (1) those that are adjacent to traditional navigable waters or non-wetland interstate water, (2) those that are adjacent to other waters where there is a "significant nexus" between the wetlands (either alone or in combination with other similarly situated waters) and the nearest downstream traditional navigable or interstate waterway; and (3) those wetlands whose use, degradation or destruction could affect interstate or foreign commerce. US EPA/Corps "Draft Guidance on Identifying Waters Protected by the Clean Water Act" at 6.

The term "adjacent" means "bordering, contiguous, or neighboring." 33 CFR § 328.3(c). The US EPA and Corps guidance considers wetlands to be adjacent if there is an unbroken surface or shallow subsurface hydrologic connection, or the wetland's physical proximity to a jurisdictional water is reasonably close. US EPA/Corps "Draft Guidance on Identifying Waters Protected by the Clean Water Act" at 16-17. Wetlands that are within the riparian area or floodplain of a jurisdictional water will generally be considered neighboring and, thus, adjacent. In addition, a demonstrable ecological connection may demonstrate the wetland is neighboring and, thus, adjacent. *Id.*

3

Wetlands have a significant nexus to traditionally navigable waters "if they, either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity of traditionally navigable waters or interstate waters." *Rapanos v. United States*, 547 U.S. 715, 780 (2006). Water functions that can show a "significant nexus" include: sediment trapping, nutrient recycling, pollutant trapping and filtering, retention or attenuation of flood waters, runoff storage, and provision of aquatic habitat. *Id.* Additionally, while a hydrological connection is not a prerequisite for showing a significant nexus, it can be evidence of one. Examples of ways in which hydrology can significantly affect downstream waters includes: "transport of water and materials and compounds carried by the waters (e.g., suspended materials, dissolved compounds), water retention, as a medium for movement of aquatic organisms such as fish and invertebrates, and water discharge (e.g., release of retained waters to other waters). The EPA and Corps Guidance explains, however, that a hydrologic connection is not necessary to establish a significant nexus, because in some cases the lack of a hydrologic connection would be a sign of the water's function in relationship to the traditionally navigable water, such as retention of flood waters that would otherwise flow to the traditionally navigable water. US EPA/Corps "Draft Guidance on Identifying Waters Protected by the Clean Water Act" at 9.

III.     Trendmaker is Liable for Monetary Penalties and Injunctive Relief

Under the CWA, citizens can seek and obtain financial penalties for violations of Section 404's prohibition on placement of dredge or fill material in navigable waters. 33 U.S.C. § 1365(a). The CWA provides that a court can order penalties of up to $37,500 per day per violation, after considering factors such as the economic benefit of the violation, the good faith efforts to comply, and the history of similar violations. *Id.* § 1319(d) ); 40 C.F.R. § 19.4. Additionally, in cases where illegal filling of wetlands has occurred without a permit, the court may order restoration of such wetlands as a remedy for the CWA violation. *See e.g. Borden Ranch Partnership et al. v. United States Army Corps of Engineers*, Civ. S-97-0858 GEB JFM, Final Order (E.D. Ca. March 3, 2000).

In addition to civil penalties, Baykeeper plans to quickly seek injunctive relief to prevent further violations under Sections 505(a) and (d) of the Clean Water Act, 33 U.S.C. § 1365(a) and (d), and such other relief as is permitted by law, including declaratory relief. Baykeeper also intends to seek attorney fees and costs for the noticed litigation, as prevailing parties are authorized to do under the Clean Water Act. 33 U.S.C. § 1365(d).

IV.     Description of Wetlands at Issue

The wetland area at issue is shown in Attachment B at Figure 2. It is primarily comprised of freshwater forested/shrub wetland and freshwater emergent wetlands. It is routinely used by white ibis, egrets and herons, and occasionally by wood storks. The presence of hydric soils, as depicted in Attachment C (Hydric Rating Map), indicates it is likely that the site has an abundance of hydrophytic vegetation, including the endangered Texas Prairie Dawn (*Hymenoxys texana*). A topographic map of the site is depicted in Attachment B, at Figure 3. In this map, it can be seen that this site is a low-lying area with overflows to both the east and southwest flowing, respectively, to Armand and Horesepen Bayous. The data clearly indicate a hydrologic connection between the wetland and traditional navigable waters. As discussed above and in Attachment B, it is clear that the wetlands in question perform functions that benefit both the water quality and storm water flows in these two bayous.

V.      Information Required by EPA Regulations Regarding Notice of Intent to Sue

Section 505(a)(1) of the Clean Water Act authorizes any person or persons having an interest which is or may be adversely affected, to commence a civil action on his own behalf to enforce the act or

to enforce certain requirements promulgated pursuant to the act. 40 C.F.R. § 135.1(a). Baykeeper is a "person" having an interest which is or may be adversely affected in that Baykeeper is a grassroots organization committed to preserving and protecting the health of Galveston Bay and its watershed through advocacy, education, and enforcement of the Clean Water Act. Members of Galveston Baykeeper use Horsepen Bayou, Armand Bayou, and Galveston Bay for recreation, including canoeing. Trendmaker Homes has indicated that it does not intend to apply for a permit to fill the wetland described above in contravention of the federal Clean Water Act § 505(a)(1). 42 U.S.C. § 1365(a)(1). Trendmaker Homes is in violation of a limitation under this chapter that requires permits for discharge of dredged fill material into navigable waters. *See* 42 U.S.C. § 1344.

VI.    Contact Information

        The full name, address and telephone number of the party providing this notice is:

                        Ms. Charlotte Cherry
                        Galveston Baykeeper
                    Vaness Hamilton, Baykeeper
                            P.O. Box 71
                        Seabrook, TX 77586
                        (281) 455-9595

        The attorneys representing Baykeeper in this matter are:

    R. Scott Jerger                         David Frederick
    Field Jerger LLP                        Lowerre, Frederick, Perales, Allmon &
    621 SW Morrison Street, Suite 1225      Rockwell
    Portland, Oregon 97205                  707 Rio Grande, Ste. 200
    (503) 228-9115                          Austin, Texas 78701
    scott@fieldjerger.com                   (512) 469-6000
                                            dof@lf-lawfirm.com

VII.   Conclusion

Baykeeper hopes that a lawsuit will not be necessary to resolve this issue and Baykeeper is certainly willing to meet or conference by telephone in an attempt to work out an agreed end to this potential dispute. Please contact either counsel's office, if you have any questions or if you wish to discuss any aspect of this notice or to discuss options for resolving the issues described in this notice. Immediately after Christmas, Baykeeper expects to begin significant preparation for litigation that can substantially increase the costs of pre-litigation settlement. As a result, if there is an interest in discussing this issue, Baykeeper suggest contacting Baykeeper's counsel at your earliest possible convenience. Baykeeper does not intend to delay the filing of a complaint past the end of the 60-day period, even if negotiations are in progress at that time.

                                                Sincerely,

                                                David Frederick

Enclosures:

5

Attachment A: NWI Map
Attachment B: Air Photo Interpretation of Wetlands on the Trendmaker Site
Attachment C: Hydric Rating by Map Unit
Attachment D: Photos of Trendmaker Development

xc:

*Via U.S. Certified Mail/RRR:*
Hon. Gina McCarthy
Administrator
Environmental Protection Agency
Ariel Rios Building, MC 4101M
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

*Via U.S. Certified Mail/RRR:*
Hr. Ron Curry
Regional Administrator
Environmental Protection Agency, Region 6
1445 Ross Avenue, Suite 1200
Dallas, Texas 75202

*Via U.S. Certified Mail/RRR:*
Mr. Zak Covar
Executive Director
Texas Commission on Environmental Quality, MC109
P.O. Box 13087
Austin, TX 78711-3087



Attachment A

# Air Photo Interpretation of Wetlands
## on the
# Trendmaker Site
## Clear Lake City Boulevard and El Dorado Avenue



September 23, 2013

## For Galveston BayKeeper

John S. Jacob, Ph.D.
Professional Wetland Scientist
Professional Geoscientist



Attachment B

## Air Photo Interpretation of Wetlands on the Trendmaker Site
## Clear Lake City Boulevard and El Dorado Avenue

September 22, 2013

John S. Jacob
Professional Wetland Scientist
Professional Geoscientist

On behalf of Galveston Baykeeper, I performed an air photo interpretation of the wetlands on the Trendmaker site (Figure 1). No on-the-ground observations or ground-truthing was undertaken in conjunction with this project. The purpose of this exercise is to identify those areas most likely to be verified as wetlands by field work.

This interpretation excluded areas already identified as wetlands in the National Wetland Inventory (NWI). The NWI for this area was conducted based on aerial photographs from 1992-93. NWI scientists used high-quality 1:24,000 aerial photographs, drawing the lines on acetate overlays[1]. Only the most distinct wetlands could be observed with the available photographs under those conditions. In my professional experience, what the NWI identified as wetlands has a very high probability of being a wetland (i.e., all three wetland parameters present), but they did not document 50-70% of the true extent of wetlands.

Wetlands were interpreted in this exercise on the basis of aerial photographic tonal patterns and lightness/darkness. The Trendmaker site sits astride an ancient Beaumont-age[2] meander ridge of the paleo Brazos River. The river left meander scars, crevasse spays, oxbow channels, and other typical riverine features on the landscape. After this surface was abandoned by the river, geomorphic processes continued to shape the landscape. Wind was an important process, as were the activities of megafauna such as mastodons and buffalo. The depressions were referred to as potholes by early settlers, and the small knolls that appear to have formed by wind deflation are referred to as pimple mounds or mima mounds. This mosaic pattern is known as the prairie-pothole pimple-mound complex. This pattern is very distinctive and easy to identify on aerial photographs. Most of the Trendmaker site is on a prairie pothole-pimple mound complex (Figure 1).

Wet areas on aerial photographs are typically much darker than surrounding well-drained areas, because of the substantially lower reflectance on moist soils and water[3] (Barrette et al., 2000). The darker the area, the wetter it is likely to be. Wetlands therefore show up much better on aerial photography taken during relatively wet periods.

---

[1] http://www.fws.gov/wetlands/NWI/Overview.html
[2] 30,000-50,000 years old. Bureau of Economic Geology Houston Sheet , by S. Aronow and V. E. Barnes. Paul Weaver Memorial Edition. 1968; revised 1982; reprinted 1996.
[3] Jeffrey Barrette, Peter August, and Francis Golet. 2000. Accuracy Assessment of Wetland Boundary Delineation Using Aerial Photography and Digital Orthophotography. Photogrammetric Engineering & Remote Sensing.

Attachment B

This study made use of available aerial photography on Google Earth, selecting for wetter years and/or wetter times of the year when the wetlands would be much more distinctive.  For this study, I selected December 1944, December 1978, and February 2010.  Wetness varies over the years, as do other phenomena; for example human management such as mowing. Thus, the use of multiple years provides a robust approach that provides a much higher degree of accuracy. A photographic signature that is present for several years has a very high probability of representing a permanent feature, such as a wetland, on the landscape.

I drew polygons, in Google Earth, around darker areas within prairie pothole-patterned zones for each of the years. I then compared each of the three maps, and constructed a new polygon set delineating only those areas where wetland patterns were distinct in at least two of the years. These areas are almost certainly in whole are in part areas with wetland vegetation, wetland hydrology, and hydric soils, the three parameters required to be present for an area to be considered a wetlands. This polygon set is the "Conservative Composite" in Figure 2.

I then constructed a separate polygon set that encompassed *any* of the areas with distinctive wetland tonal papers. These are areas that have a relatively high probability of meeting the requirements for wetlands, broad but with somewhat less probability than that described for the Conservative estimate. This broader set is labeled as the Inclusive Composite in Figure 2.

It is clear that a significant amount of wetlands are going to be found on the Trendmaker site. We cannot precisely delineate wetland boundaries because we do not have access to the site. The air photo signature for the prairie-pothole pimple-mound complex, however, is unmistakable. That dark tonal patterns are found in this complex across several years of aerial photography in the same spots is strongly indicative of saturation and inundation occurring in these areas year after year.

### Significant Nexus Analysis

Wilcox et al[4]. and Forbes et al[5]. have demonstrated that wetlands exactly of the class examined in this report have a very strong hydrologic nexus to traditional navigable waters (TNW). The TNW for this particular group of wetlands is Armand Bayou. Figure 3 shows that this group of wetlands forms the headwaters for Horsepen Bayou, which then drains into Armand Bayou. Natural drainage was disrupted with the construction of Clear Lake City in the early to mid 1990's. Drainage from this pothole complex still likely drains into Horsepen Bayou, but some of the drainage may have been rerouted to the east along Clear Lake City Boulevard, draining directly into Armand Bayou.

### Summary and Conclusion

The NWI maps and the mapping from this exercise established that there is an abundance of wetlands on the Trendmaker site. Two peer-reviewed research projects have demonstrated a very significant hydrologic nexus for similar wetland not 2 miles away to the west and the east. Because of this nexus,

[4] Wilcox, B. P., Dean, D. D., Jacob, J. S., & Sipocz, A. (2011). Evidence of surface connectivity for Texas Gulf Coast depressional wetlands. *Wetlands*,*31*(3), 451-458.
[5] Enwright, N., Forbes, M. G., Doyle, R. D., Hunter, B., & Forbes, J. (2011). Using geographic information systems (GIS) to inventory coastal prairie wetlands along the upper Gulf Coast, Texas. *Wetlands*, *31*(4), 687-697.

3

Attachment B

any wetland disturbance should be mitigated, as the loss of these wetlands will damage the water quality of Horsepen Bayou, Armand Bayou, Clear Lake, and Galveston Bay, all traditional navigable waters of the US.

In addition, the prairie pothole pattern observed at the Trendmaker site is becoming quite rare. At this particular site, it is particularly rare, as it is extremely unusual to find this quality of a wetland complex surrounded by urbanization. Thus, some consideration should be given to denying a permit for fill of the wetlands given the increasing rarity of this complex and the cumulative and secondary impacts that have destroyed almost all similar wetlands in the Horsepen Bayou watershed.

Attachment B

# Photos



Figure 1. The Trendmaker site (red outline) on 1944 Google Earth image. The dark oblong and rounded areas are prairie potholes, with varying degrees of wetness. The small with dots are pimple or mima mounds. The potholes are about 1-1.5 ft deep, and the pimple mounds 1-2 feet high. The northern E-W boundary line is about 4200 ft long.

5



Figure 2. Results of air photo interpretation mapping. Aqua-colored are areas where wetland patterns were very distinctive in a least 2 out of the 3 years examined polygons (the Conservative Composite). The yellow polygons are areas where wetland patterns occurred in any of the 3 years (the Inclusive Composite). The green polygons are from the National Wetlands Inventory.

6



Figure 3. USGS Topo map for the Trendmaker area. The blue line overlays a natural drain drawn on the topo map. Natural drainage was into Horsepen Bayou and thence to Armand Bayou, both TNW. Clear Lake City Boulevard (see above photos) may have rerouted some of the drainage of this pothole complex directly to Armand Bayou.

7

Attachment B



Figure 4. December 1944 aerial photo with interpreted wetlands. (NWI in green)



Figure 5. December 1978 aerial photo with interpreted wetlands.

8

Attachment B



Figure 6. February 2010 air photo interpretation of wetlands.

Attachment B



Attachment C

Hydric Rating by Map Unit—Harris County, Texas
(Trendmaker Hydric Soils)

## MAP LEGEND

**Area of Interest (AOI)**

☐ Area of Interest (AOI)

**Soils**

**Soil Rating Polygons**

☐ Hydric (100%)

☐ Predominantly Hydric (66 to 99%)

☐ Partially hydric (33 to 65%)

☐ Predominantly nonhydric (1 to 32%)

☐ Nonhydric (0%)

☐ Not rated or not available

**Soil Rating Lines**

⌇ Hydric (100%)

⌇ Predominantly Hydric (66 to 99%)

⌇ Partially hydric (33 to 65%)

⌇ Predominantly nonhydric (1 to 32%)

⌇ Nonhydric (0%)

⌇ Not rated or not available

**Soil Rating Points**

■ Hydric (100%)

■ Predominantly Hydric (66 to 99%)

■ Partially hydric (33 to 65%)

■ Predominantly nonhydric (1 to 32%)

■ Nonhydric (0%)

☐ Not rated or not available

**Water Features**

　 Streams and Canals

**Transportation**

┼┼┼ Rails

～ Interstate Highways

～ US Routes

～ Major Roads

～ Local Roads

**Background**

　 Aerial Photography

## MAP INFORMATION

The soil surveys that comprise your AOI were mapped at 1:20,000.

Please rely on the bar scale on each map sheet for map measurements.

Source of Map:   Natural Resources Conservation Service
Web Soil Survey URL:   http://websoilsurvey.nrcs.usda.gov
Coordinate System:   Web Mercator (EPSG:3857)

Maps from the Web Soil Survey are based on the Web Mercator projection, which preserves direction and shape but distorts distance and area. A projection that preserves area, such as the Albers equal-area conic projection, should be used if more accurate calculations of distance or area are required.

This product is generated from the USDA-NRCS certified data as of the version date(s) listed below.

Soil Survey Area:   Harris County, Texas
Survey Area Data:   Version 11, Sep 20, 2012

Soil map units are labeled (as space allows) for map scales 1:50,000 or larger.

Date(s) aerial images were photographed:     Jan 26, 2011—Mar 6, 2011

The orthophoto or other base map on which the soil lines were compiled and digitized probably differs from the background imagery displayed on these maps. As a result, some minor shifting of map unit boundaries may be evident.

Attachment C

## Hydric Rating by Map Unit

| Hydric Rating by Map Unit— Summary by Map Unit — Harris County, Texas (TX201) | | | | |
|---|---|---|---|---|
| Map unit symbol | Map unit name | Rating | Acres in AOI | Percent of AOI |
| Ad | Addicks loam | 90 | 273.4 | 5.8% |
| Ba | Beaumont clay | 95 | 294.2 | 6.2% |
| Bd | Bernard clay loam | 10 | 1,587.9 | 33.7% |
| Bg | Bernard-Urban land complex | 0 | 16.1 | 0.3% |
| Ge | Gessner loam | 85 | 165.1 | 3.5% |
| LcA | Lake Charles clay, 0 to 1 percent slopes | 0 | 1,764.0 | 37.4% |
| Lu | Lake Charles-Urban land complex | 0 | 67.1 | 1.4% |
| Md | Verland silty clay loam | 15 | 28.7 | 0.6% |
| Na | Nahatche loam | 95 | 11.7 | 0.2% |
| VaA | Vamont clay, 0 to 1 percent slopes | 0 | 247.8 | 5.3% |
| VaB | Vamont clay, 1 to 4 percent slopes | 0 | 232.7 | 4.9% |
| W | Water | 0 | 24.5 | 0.5% |
| Totals for Area of Interest | | | 4,713.1 | 100.0% |

USDA  Natural Resources
Conservation Service

Web Soil Survey
National Cooperative Soil Survey

10/23/2013
Page 3 of 6

Attachment C

## Description

This rating indicates the proportion of map units that meets the criteria for hydric soils. Map units are composed of one or more map unit components or soil types, each of which is rated as hydric soil or not hydric. Map units that are made up dominantly of hydric soils may have small areas of minor nonhydric components in the higher positions on the landform, and map units that are made up dominantly of nonhydric soils may have small areas of minor hydric components in the lower positions on the landform. Each map unit is designated as "hydric," "predominantly hydric," "partially hydric," "predominantly nonhydric," or "nonhydric" depending on the rating of its respective components and the percentage of each component within the map unit.

"Hydric" means that all components listed for a given map unit are rated as being hydric. "Predominantly hydric" means components that comprise 66 to 99 percent of the map unit are rated as hydric. "Partially hydric" means components that comprise 33 to 66 percent of the map unit are rated as hydric. "Predominantly nonhydric" means components that comprise up to 33 percent of the map unit are rated as hydric. "Nonhydric" means that none of the components are rated as hydric. The assumption here is that all components of the map unit are rated as hydric or nonhydric in the underlying database. A "Not rated or not available" map unit rating is displayed when none of the components within a map unit have been rated.

In Web Soil Survey, the Summary by Map Unit table that is displayed below the map pane contains a column named 'Rating'. In this column the percentage of each map unit that is classified as being hydric is displayed.

Hydric soils are defined by the National Technical Committee for Hydric Soils (NTCHS) as soils that formed under conditions of saturation, flooding, or ponding long enough during the growing season to develop anaerobic conditions in the upper part (Federal Register, 1994). Under natural conditions, these soils are either saturated or inundated long enough during the growing season to support the growth and reproduction of hydrophytic vegetation.

The NTCHS definition identifies general soil properties that are associated with wetness. In order to determine whether a specific soil is a hydric soil or nonhydric soil, however, more specific information, such as information about the depth and duration of the water table, is needed. Thus, criteria that identify those estimated soil properties unique to hydric soils have been established (Federal Register, 2002). These criteria are used to identify map unit components that normally are associated with wetlands. The criteria used are selected estimated soil properties that are described in "Soil Taxonomy" (Soil Survey Staff, 1999) and "Keys to Soil Taxonomy" (Soil Survey Staff, 2006) and in the "Soil Survey Manual" (Soil Survey Division Staff, 1993).

If soils are wet enough for a long enough period of time to be considered hydric, they should exhibit certain properties that can be easily observed in the field. These visible properties are indicators of hydric soils. The indicators used to make onsite determinations of hydric soils are specified in "Field Indicators of Hydric Soils in the United States" (Hurt and Vasilas, 2006).

Attachment C

References:

Federal Register. July 13, 1994. Changes in hydric soils of the United States.

Federal Register. September 18, 2002. Hydric soils of the United States.

Hurt, G.W., and L.M. Vasilas, editors. Version 6.0, 2006. Field indicators of hydric soils in the United States.

Soil Survey Division Staff. 1993. Soil survey manual. Soil Conservation Service. U.S. Department of Agriculture Handbook 18.

Soil Survey Staff. 1999. Soil taxonomy: A basic system of soil classification for making and interpreting soil surveys. 2nd edition. Natural Resources Conservation Service. U.S. Department of Agriculture Handbook 436.

Soil Survey Staff. 2006. Keys to soil taxonomy. 10th edition. U.S. Department of Agriculture, Natural Resources Conservation Service.

## Rating Options

*Aggregation Method:*  Percent Present

Aggregation is the process by which a set of component attribute values is reduced to a single value that represents the map unit as a whole.

A map unit is typically composed of one or more "components". A component is either some type of soil or some nonsoil entity, e.g., rock outcrop. For the attribute being aggregated, the first step of the aggregation process is to derive one attribute value for each of a map unit's components. From this set of component attributes, the next step of the aggregation process derives a single value that represents the map unit as a whole. Once a single value for each map unit is derived, a thematic map for soil map units can be rendered. Aggregation must be done because, on any soil map, map units are delineated but components are not.

For each of a map unit's components, a corresponding percent composition is recorded. A percent composition of 60 indicates that the corresponding component typically makes up approximately 60% of the map unit. Percent composition is a critical factor in some, but not all, aggregation methods.

The aggregation method "Percent Present" returns the cumulative percent composition of all components of a map unit for which a certain condition is true. For example, attribute "Hydric Rating by Map Unit" returns the cumulative percent composition of all components of a map unit where the corresponding hydric rating is "Yes". Conditions may be simple or complex. At runtime, the user may be able to specify all, some or none of the conditions in question.

*Component Percent Cutoff:*  None Specified

Components whose percent composition is below the cutoff value will not be considered. If no cutoff value is specified, all components in the database will be considered. The data for some contrasting soils of minor extent may not be in the database, and therefore are not considered.

*Tie-break Rule:*  Lower


Attachment C

The tie-break rule indicates which value should be selected from a set of multiple candidate values, or which value should be selected in the event of a percent composition tie.

Attachment C

# Photos of Trendmaker Homes Development and Fill Activity





Attachment D





Attachment D





Attachment D