IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GALVESTON BAYKEEPER, INC., | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | NO.  4:14-CV-01500 |
| TRENDMAKER HOMES, INC., a | § | |
| Texas Corporation, and TRENDMAKER | § | |
| CLEAR LAKE, LLC, a Texas Limited | § | |
| Liability Company, | § | |
| Defendants. | § | |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS BAYKEEPER'S COMPLAINT FOR LACK OF STANDING

## TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................... 1

LAW AND ARGUMENT .................................................................................................. 1

I.    The injuries that Baykeeper's members allege to support standing are attributable to other pollutants from other sources, and are not fairly traceable to Trendmaker's placement of fill on its Property. ..........................................................................................2

    A.    Baykeeper fails to meet two elements in the three-part *Powell Duffryn* test. ...............2

        1.    Baykeeper's members have no interest in the wetlands where the placement of fill has occurred. ..........................................................................................3

        2.    Trendmaker's placement of fill does not "cause or contribute to" the alleged water quality impacts in Armand and Horsepen Bayous. .....................................4

    B.    Trendmaker's placement of fill on the Property does not make Trendmaker responsible for pollution originating from offsite locations. ........................................7

II.   Baykeeper lacks standing because its members have not suffered any actual injury-in-fact. ....................................................................................................................9

    A.    Without any use of lands or waters in or near the Property, Baykeeper's members do not suffer any injury-in-fact. ...................................................................................9

    B.    Baykeeper's claimed injuries from stormwater discharges are not injuries-in-fact because, as permitted discharges, they cannot be "invasions of a legally protected interest." ..................................................................................................................12

    C.    Baykeeper's claimed flooding injury is speculative, conjectural, and not particularized .............................................................................................................14

CONCLUSION .................................................................................................................. 15

i

# TABLE OF AUTHORITIES

**Cases**

*Cantrell v. City of Long Beach*,
    241 F.3d 674 (9th Cir. 2001) ........................................................ 9

*Claybrook v. Slater*,
    111 F.3d 904 (D.C. Cir. 1997) ..................................................... 14

*Friends of the Earth v. Consolidated Rail Corp.*,
    768 F.2d 57 (2d Cir. 1985) ........................................................... 11

*Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp.*,
    95 F.3d 358 (5th Cir. 1996) ................................................... 2, 3, 10

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*,
    204 F.3d 149 (4th Cir. 2000) ......................................................... 6

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ..................................................................... 13

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ......................................................... 10, 13, 15

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ................................................................. 5, 10

*Pollack v. U.S. Dep't of Justice*,
    577 F.3d 736 (2009) ....................................................................... 9

*Pub. Interest Research Group of N.J., Inc. v. Powell Duffryn Terminals Inc.*,
    913 F.2d 64 (3d Cir. 1990) .................................................. 2, 3, 5, 6

*Save Our Cmty. v. U.S. E.P.A.*,
    741 F. Supp. 605 (N.D. Tex. 1990) ......................................... 9, 11

*Save Our Cmty. v. U.S. E.P.A.*,
    971 F.2d 1155 (5th Cir. 1992) ..................................................... 11

*Sierra Club v. Peterson*,
    185 F.3d 349 (5th Cir. 1999) ......................................................... 5

*Sierra Club v. Simkins Indus., Inc.*,
    847 F.2d 1109 (4th Cir. 1988) ..................................................... 11

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*,
    73 F.3d 546 (5th Cir. 1996) .............................................. 2, 3, 10, 11

*United States v. Acquest Transit LLC*,
    No. 09-CV-055S, 2009 U.S. Dist. LEXIS 60337 (W.D.N.Y 2009) .................................. 9

*United States v. Cundiff*,
    555 F.3d 200 (6th Cir. 2009) ............................................................................. 9

*United States v. Metro. St. Louis Sewer Dist. (MSD)*,
    883 F.2d 54 (8th Cir. 1989) .............................................................................. 11

*United States v. Rapanos*,
    547 U.S. 715 (2006) .......................................................................................... 4

*United States v. Students Challenging Regulatory Agency Procedures*,
    412 U.S. 669 (1973) .......................................................................................... 5

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) .......................................................................................... 5

**MAY IT PLEASE THE COURT:**

Trendmaker Clear Lake, LLC ("Trendmaker") and Trendmaker Homes, Inc. (collectively with Trendmaker, "Defendants") file this Reply in Support of Their Motion to Dismiss plaintiff Galveston Baykeeper, Inc.'s ("Baykeeper") Second Amended Complaint (the "Complaint") under Federal Rule of Civil Procedure 12(b)(1) and respectfully show the Court as follows:

## INTRODUCTION

Baykeeper spends much of its brief arguing that Trendmaker's placement of one pollutant in one location makes Trendmaker responsible for water quality impacts caused by other pollutants, from other sources, in locations other than where Trendmaker has placed fill. Baykeeper fails to bridge each of these gaps and fails to demonstrate that the alleged water quality impacts, primarily from nitrogen and phosphorus, in Armand and Horsepen Bayous are fairly traceable to Trendmaker's placement of fill dirt on its Property over a mile away. Baykeeper also makes no persuasive argument that it has suffered any injury-in-fact from stormwater discharges from the Property. These discharges are authorized under the Clean Water Act and are therefore not an invasion of any legally protected interest.

## LAW AND ARGUMENT

Baykeeper fails to meet two elements required to show that it has standing to pursue its claims. A plaintiff must show that it or its members have suffered an injury-in-fact, where that injury is fairly traceable to the defendant's action, and where it is likely that a favorable decision will redress the injury.[1] Baykeeper does not have standing to sue because the alleged injuries are not fairly traceable to Trendmaker's actions, but are the result of the independent action of other third parties not before the Court. Furthermore, Baykeeper lacks standing because its members

---

[1] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

have not suffered any actual injury-in-fact—an invasion of a legally protected interest that is concrete and particularized, and actual or imminent, not conjectural or hypothetical.

## I.   The injuries that Baykeeper's members allege to support standing are attributable to other pollutants from other sources, and are not fairly traceable to Trendmaker's placement of fill on its Property.

The pollutants causing the water quality impairments about which Baykeeper complains originate, according to Baykeeper, in precipitation falling onto the Property and adjacent properties.[2]   The factual predicate for Baykeeper's complaint is that Trendmaker's placement of fill on its Property means that its wetlands will no longer intercept existing pollution from other sources as that pollution travels toward and into Armand and Horsepen Bayous.   Importantly, however, it is the separate discharge of these other pollutants, not the discharge of fill, that causes Baykeeper's alleged injuries.   Under the legal test the Fifth Circuit uses to determine whether an injury is fairly traceable to a particular defendant's activities—from *Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals Inc.*[3]—the alleged water quality injuries are not fairly traceable to Trendmaker's placement of fill.

### A.   Baykeeper fails to meet two elements in the three-part *Powell Duffryn* test.

In water pollution cases, the Fifth Circuit uses the *Powell Duffryn* test to determine whether an injury is fairly traceable to a particular defendant's discharge.[4]   Under *Powell Duffryn*, an injury is fairly traceable to a defendant if the defendant has (1) discharged some pollutant in concentrations greater than allowed by its permit (2) into a waterway in which the plaintiff has an interest that is or may be adversely affected by the pollutant, and (3) the pollutant

---

[2] *See* Doc. 35, Galveston Baykeeper, Inc., Resp. to Def.'s Mot. to Dismiss 22–23; Doc. 35-4, Ross Decl. ¶¶ 12–16, Nov. 21, 2014.

[3] 913 F.2d 64, 72 (3d Cir. 1990).

[4] *See Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 557–58 (5th Cir. 1996); *Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp.*, 95 F.3d 358, 360–61 (5th Cir. 1996).

causes or contributes to the kinds of injuries alleged by the plaintiff.[5]  Baykeeper argues that Trendmaker's placement of fill satisfies this test, but it fails the second and third elements.[6]

       *1.*   *Baykeeper's members have no interest in the wetlands where the placement of fill has occurred.*

Baykeeper cannot meet the second element because its members do not have an "interest" in the area—alleged to be waters of the United States—where the discharge of fill has occurred.  In *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*,[7] the Fifth Circuit evaluated what constitutes a plaintiff's interest.  There, the court focused on testimony that a Sierra Club member recreated in the vicinity of Cedar Point's discharges into Galveston Bay.[8]  According to the court, this member's "use of the specific area of the Bay in which unlawful discharges occurred played an important role" in the court's decision to find standing.[9]  In *Friends of the Earth, Inc. v. Crown Central Petroleum Corp.*, on the other hand, the court found that the plaintiffs' use of a waterway was too far downstream (eighteen miles), and they therefore lacked interest in the waterway near enough to where unlawful pollution flowed.[10]

Baykeeper's members must use the waterway where the fill is being discharged, and must use it near enough to where the fill is being discharged.  Baykeeper's members do not, however, use the depressional areas alleged to be waters of the United States.  Trendmaker has placed fill

---

[5] *Powell Duffryn*, 913 F.2d at 72.

[6] The first element is only met if the depressional areas on the Property are "waters of the United States" and therefore require permitting under Section 404 of the Clean Water Act for the discharge of fill.  Baykeeper has alleged this to be the case, and Defendants assume that element is met only for the purposes of evaluating Baykeeper's standing.

[7] 73 F.3d 546 (5th Cir. 1996).

[8] *Id.* at 557–58.

[9] *Crown Cent.*, 95 F.3d at 361.

[10] *Id.*

into a group of wetlands, not Armand or Horsepen Bayous.[11]  Furthermore, the wetlands are on private property, and the ditch and adjoining land between the Property and Armand Bayou are also private.  Baykeeper's members confirmed that they do not use the wetlands or any adjoining areas any closer than Armand Bayou 1.16 miles eastward.[12]  As a result, Baykeeper fails to meet the second element because it has not shown the discharge of any fill into the two waterways, Armand or Horsepen Bayous, where its members have claimed an interest.

> 2.   *Trendmaker's placement of fill does not "cause or contribute to" the alleged water quality impacts in Armand and Horsepen Bayous.*

Baykeeper cannot meet the third element because the placement of fill does not "cause or contribute to" the kinds of injuries Baykeeper's members allege they will experience from increased nutrient loading.  Baykeeper's claimed injuries focus primarily on nutrients that arrive on the Property through precipitation and then eventually reach the bayous through stormwater discharges.  Baykeeper claims that these pollutants cause water quality impacts such as low dissolved oxygen, increased algal growth, and increased microbial activity.[13]  These are recognized impacts of nutrient pollutants.  Baykeeper does not allege, however, that fill dirt causes low dissolved oxygen, increased algal growth, increased microbial activity, or the other alleged water quality impacts.  It is the incoming nutrient pollutants themselves that Baykeeper alleges to be causing or contributing to the alleged injuries, not the fill Trendmaker places on the Property.

---

[11] Even if one assumes that the presence of characteristics between the Property's wetlands and the bayous meet the "significant nexus" test from *United States v. Rapanos*, 547 U.S. 715 (2006), which is used to determine federal jurisdiction, the wetlands are not the same "waterway" as either bayou.

[12] *See* Doc. 29, Trendmaker Mot. to Dismiss 10–12.

[13] *See* Doc. 35, Galveston Baykeeper, Inc., Resp. to Def.'s Mot. to Dismiss 22; Doc. 35-4, Ross Decl. ¶¶ 19–20.

Baykeeper relies on *United States v. Students Challenging Regulatory Agency Procedures*[14] ("SCRAP") to support its argument attributing indirect and attenuated causation to Trendmaker for other pollution originating from other sources, but this reliance is misplaced. *SCRAP* was a 1973 case about a plaintiff's procedural rights in challenging agency action under the National Environmental Policy Act.[15]  The Supreme Court has noted that *SCRAP* "has never since been emulated by this Court."[16]  The Fifth Circuit specifically cited *SCRAP* when it said in 1999 that *Lujan v. Defenders of Wildlife* "likely eviscerated certain prior cases that afforded procedural rights plaintiffs standing where the three-part test was not met."[17]  The appropriate test to determine standing is the three-part injury-in-fact, fairly traceable, and redressability test summarized in *Lujan*.  In addition, for the fairly traceable element in water pollution cases, the Fifth Circuit uses the *Powell Duffryn* test to determine whether an injury is fairly traceable to a particular defendant's discharge.

In *Powell Duffryn*, the court noted that water pollution cases often involve several parties discharging into the affected waterway where the pollution of any one may be shown to cause some part of the injury suffered.[18]  The "contribute" language allows a plaintiff to obtain standing without needing to sue every discharger in a single action.[19]  A plaintiff does not need

---

[14] 412 U.S. 669 (1973).

[15] *Id.* at 679–80.

[16] *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990); *see also Whitmore v. Arkansas*, 495 U.S. 149, 159 (1990).

[17] *Sierra Club v. Peterson*, 185 F.3d 349, 361 n.13 (5th Cir. 1999).

[18] *Public Interest Research Group of N.J., Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 72 n.8 (3d Cir. 1990) .

[19] *Id.*

to pinpoint the exact origins of the particular molecules causing the alleged injury; as long as the defendant is discharging pollutants that cause that injury, the fairly traceable element is met.[20]

The *Powell Duffryn* court stated that "if a plaintiff has alleged some harm, that the waterway is unable to support aquatic life for example, but failed to show that defendant's effluent contains pollutants that harm aquatic life, then plaintiffs would lack standing."[21]  Here, Baykeeper has alleged some harm, that Armand and Horsepen Bayous will be impaired by increased nutrient loading.  Yet Baykeeper failed to show that Trendmaker's discharge—fill placed onto its Property—contains pollutants that cause increased nutrient loading.  In this context, it is clear that the "causes or contributes" language refers to a discharger's action in placing a pollutant into the waterway, not a discharger's possible role in contributing to a potential chain of events where other pollutants originating from other sources may eventually cause injury at some other location or in some other waterway.

Furthermore, where a plaintiff has identified a polluting source as the seed of his injury, the owner of the polluting source may supply an alternative culprit to defeat the "fairly traceable" element.[22]  Here, Baykeeper supplied declarations from Dr. Lauren Ross and Dr. John Jacob identifying rainfall as the source of the primary nitrogen and phosphorus inputs to storm runoff and coastal wetland water.[23]  Mark Kramer testified that airborne pollutants and toxins originate in the "highly industrialized and urbanized area" around the Property, including the "significant chemical production area" of the nearby Pasadena Industrial District.[24]  The future

---

[20] *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000).

[21] *Powell Duffryn*, 913 F.2d at 72–73.

[22] *Gaston Copper Recycling*, 204 F.3d at 162.

[23] Doc. 35-4, Ross Decl. ¶ 12; Doc. 35-5, Jacob Decl. ¶ 12, Nov. 21, 2014.

[24] Doc. 29-6, Kramer Dep. 53:25-54:8; 57:10-17 (Sept. 11, 2014).

discharge of pollutants washed out of the sky through rainfall is not fairly traceable to Trendmaker's placement of fill on its Property.[25]  As discussed later, the subsequent discharge of stormwater that may contain these pollutants, both from the Property into the Clear Lake City Water Authority sewer system, and then from the sewer system into the bayous, is authorized under permits issued under Section 402 of the Clean Water Act.  Baykeeper's alleged injuries, which are caused by the aerial deposition of nutrients and their permitted discharge through stormwater, are not fairly traceable to Trendmaker's placement of fill on the Property.

**B.   Trendmaker's placement of fill on the Property does not make Trendmaker responsible for pollution originating from offsite locations.**

Contrary to Baykeeper's plaint that its argument has been mischaracterized, the Complaint, testimony from Baykeeper's members, and Baykeeper's response confirm that the alleged injuries are distinct from Trendmaker's placement of fill.

Baykeeper's Complaint alleges that Trendmaker's placement of fill on the Property injures its members.[26]  The placement of fill itself, however, is not the discharge causing these alleged injuries.  Other, separate discharges cause them.  Baykeeper's Complaint discusses these two separate discharges.  The first is Trendmaker's discharge of fill onto the Property.[27]  The second is *other* discharges of *other* pollutants into Armand Bayou, Horsepen Bayou, and other downstream waters.[28]  For example, Baykeeper alleges that without the wetlands, various water-borne and atmospheric pollutants from other sources will not be captured in the wetlands,

---

[25] Indeed, there are several ways these pollutants might be diverted away from entering into the depressional areas on the Property.  Tent or tarp coverings or upland ditches conveying water away from the wetlands would lead to the same alleged water quality impacts regardless of the placement of fill on the Property.

[26] Doc. 27, Galveston Baykeeper, Inc., Second Am. Compl. ¶¶ 18, 65.

[27] Doc. 27, Galveston Baykeeper, Inc., Second Am. Compl. ¶¶ 1, 3, 14, 52, 61, 62, 67, 69.

[28] Doc. 27, Galveston Baykeeper, Inc., Second Am. Compl. ¶¶ 26, 66.

but will be discharged and then degrade downstream waters.[29]  Baykeeper also claims that there will be pollutant discharges *into* Armand and Horsepen Bayous,[30] but because Baykeeper does not allege that Trendmaker has or will discharge any fill into Armand or Horsepen Bayous, this must refer to the discharge of other pollutants, largely nitrogen and phosphorus, not captured in the Property's alleged waters of the United States.

In addition, Baykeeper's members testified to injury from alleged water quality impacts attributable to the discharge of nutrients, sediment, toxins, chemicals, bacteria, and garbage.[31] None of these pollutants originate in the fill Trendmaker is placing on the Property.  Baykeeper's response contains extensive discussion of the pollutants that cause the water quality impacts. According to Baykeeper, these are primarily nitrogen and phosphorus from rain falling in the area and reaching Armand and Horsepen Bayous as part of stormwater flows.[32]  Trendmaker's fill is not the source of these pollutants or the cause of this pollution.[33]

Baykeeper argues that because wetlands filter pollutants, any action that Trendmaker takes in preventing these pollutants from being filtered on its Property, such as placing fill in wetlands on its Property, makes Trendmaker responsible for these transient pollutants.  In support of this, Baykeeper cites cases where courts considered these wetlands functions in determining that the wetlands shared a chemical or ecological connection with waters of the

---

[29] *See* Doc. 27, Galveston Baykeeper, Inc., Second Am. Compl. ¶ 26.

[30] *See* Doc. 27, Galveston Baykeeper, Inc., Second Am. Compl. ¶ 66.

[31] *See, e.g.*, Doc. 29-9, Aguilar Dep. 73:23–74:23, 97:12-21, Def.'s Ex. 1 at 5, ¶ 9 (Sept. 13, 2014); Doc. 29-6, Kramer Dep. 48:4–49:23, 53:25–56:23; Doc. 29-5, Bell Dep. 39:11–20, Def.'s Ex. 1 at 7–8, ¶¶ 10–12 (Sept. 11, 2014); Doc. 29-8, Hamilton Dep. 59:13–61.17 (Sept. 12, 2014).

[32] *See* Doc. 35, Galveston Baykeeper, Inc., Resp. to Def.'s Mot. to Dismiss 22–23; Doc. 35-4, Ross Decl. ¶¶ 12–16.

[33] As discussed in Section II *infra*, inasmuch as Trendmaker is responsible for its discharge of stormwater, its discharge to the Clear Lake City Water Authority sewer system, and the Clear Lake City Water Authority's discharge of the stormwater to the bayous, are permitted under Section 402 of the Clean Water Act.  Baykeeper has not alleged any violation related to those discharges.

United States.[34]  Connectivity, however, is not the issue here, especially since Baykeeper does not allege the transport of the fill into Armand or Horsepen Bayous.  The issue is whether the presence or discharge of non-fill pollutants from other sources is fairly traceable to a person filling a wetland simply because the wetland no longer captures pollutants from these other sources.  Neither court discussed this issue, and Baykeeper has cited no other authority supporting its response.

## II.  Baykeeper lacks standing because its members have not suffered any actual injury-in-fact.

### A.  Without any use of lands or waters in or near the Property, Baykeeper's members do not suffer any injury-in-fact.

In their Motion to Dismiss, Defendants identified gaps in geography between the area where Trendmaker is discharging fill and the remote areas where Baykeeper's members claim injuries to their use of lands and waters.[35]  Contrary to Baykeeper's claim,[36] Trendmaker does not argue that Baykeeper's members must have access to the Property to establish standing.  Rather, Baykeeper's members must *somehow* bridge the gaps in geography to demonstrate an actual injury.[37]  For example, a person could own or use neighboring property and have an interest in visually observing the wetlands without physically accessing the property.[38]  None of

---

[34] *United States v. Cundiff*, 555 F.3d 200 (6th Cir. 2009); *United States v. Acquest Transit LLC*, No. 09-CV-055S, 2009 U.S. Dist. LEXIS 60337 (W.D.N.Y 2009).

[35] Doc. 29, Trendmaker Mot. to Dismiss 10–13.

[36] Doc. 35, Galveston Baykeeper, Inc., Resp. to Def.'s Mot. to Dismiss 12.

[37] *See Pollack v. U.S. Dep't of Justice*, 577 F.3d 736, 746 (2009) (Cudahy, J., concurring) (stating that the farther the plaintiff is from the area of injury, the more evidence the plaintiff must generally put forth to show he is among the injured).

[38] *See, e.g., Save Our Cmty. v. U.S. E.P.A.*, 741 F. Supp. 605, 611 (N.D. Tex. 1990), *aff'd*, 971 F.2d 1155 (5th Cir. 1992) (crediting injury to a nearby property owner who had observed the wetlands for nearly forty years and had seen the wetlands used by various migratory birds); *Cantrell v. City of Long Beach*, 241 F.3d 674, 681 (9th Cir. 2001) (crediting injury to birdwatchers who lacked site access but who asserted their practice of viewing the site from nearby publicly accessible locations).

Baykeeper's members claim to use any of the Property, any of the adjacent properties, or any land closer than just over a mile away, the distance eastward to Armand Bayou.[39]  Moreover, none claim any visual or aesthetic activities involving the Property's wetlands from adjacent properties.  The plaintiff alleging the injury "must use the area affected by the challenged activity and not an area roughly in the vicinity of it."[40]  Baykeeper's response fails to bridge the gaps between the placement of fill on the Property and the remote areas where Baykeeper's members allege injuries to their use of lands and waters.

Alternatively, the transport of a pollutant from the point of discharge into and through a waterway to a remote location used by plaintiff could, if near enough, bridge the gaps in geography.  This is a common scenario in cases alleging a violation of Section 402 for unpermitted effluent discharges to water,[41] not Section 404 discharges of fill material.  But even this has it limits.[42]  Regardless, none of Baykeeper's members claim injury attributable to discharged fill that was transported to areas where those members use lands and waters.  Moreover, Baykeeper has not specifically pled that Trendmaker is discharging fill anywhere other than on its Property or that any alleged injury suffered in the bayous is from fill that has been conveyed into the bayous.

---

[39] Dr. John Jacob claims injury to his scientific interest, based solely on the study of aerial photographs, because "one more set of wetlands will be gone to study and teach about." Doc. 29-7, Jacob Dep. Def.'s Ex. 1 at 2, ¶ 13.  As Trendmaker noted in its Motion to Dismiss, such an alleged injury grounded entirely on the study of aerial photographs is neither actual nor concrete.  Baykeeper has provided no response to this argument.

[40] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 565–66 (1992) (internal quotations omitted); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 886–89 (1990).

[41] *See, e.g., Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp.*, 95 F.3d 358, 361 (5th Cir. 1996); *Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546, 557 (5th Cir. 1996).

[42] *See Crown Cent.*, 95 F.3d at 361 (denying standing because plaintiff members' interests and alleged injuries were too remote, *i.e.*, eighteen river miles downstream through three tributaries to a lake).

Rather than confronting these gaps, Baykeeper focuses on a "low threshold for sufficiency in injury" and cites cases purporting to show plaintiffs demonstrating standing where injuries occur at a location remote from the actual discharge site.[43]  These cases do not help Baykeeper bridge the gaps necessary to show an injury-in-fact.

Baykeeper first relies on *Save Our Community v. U.S. Environmental Protection Agency*, which addresses the ability of a citizens group to bring an action challenging the draining of wetlands on a proposed site for a landfill expansion.[44]  In finding standing, the Fifth Circuit pointed to testimony by group members that they owned property near the wetlands at issue, and enjoyed the wildlife, aesthetics, open space, ecological and other values of the wetlands themselves.[45]  Here, Baykeeper's members claim no use closer than over a mile away, and they allege no direct observation of the wetlands.[46]

Baykeeper next discusses *Sierra Club v. Cedar Point Oil Co. Inc.*, a case in which Cedar Point discharged produced water directly into Galveston Bay, and Sierra Club members claimed injuries to their use of the bay.[47]  As discussed in Section I.A.1 *supra*, the court found standing after crediting testimony about a plaintiff member's use of the specific area where the unlawful

---

[43] Doc. 35, Galveston Baykeeper, Inc., Resp. to Def.'s Mot. to Dismiss 10–13.

[44] 971 F.2d 1155, 1157 (5th Cir. 1992).

[45] *Save Our Cmty.*, 971 F.2d at 1160–61; *see also Save Our Cmty. v. U.S. E.P.A.*, 741 F. Supp. 605, 611 (N.D. Tex. 1990) (discussing one member's observation of the wetlands and various migratory bird use of the wetlands over nearly forty years).

[46] *Save Our Cmty.*, 971 F.2d at 1160–61.  Baykeeper's mention of other circuits accepting a "low threshold for sufficiency in injury" is likewise unhelpful to Baykeeper's argument.  In each of those cases, collected in *Save Our Community*, plaintiffs made actual use of the waterbodies where the discharges occurred or were transported.  *See United States v. Metro. St. Louis Sewer Dist. (MSD)*, 883 F.2d 54, 56 (8th Cir. 1989) (plaintiffs directly accessed and observed the river into which pollutants were discharged); *Sierra Club v. Simkins Indus., Inc.*, 847 F.2d 1109, 1112 n.3 & 1113 (4th Cir. 1988) (plaintiffs made actual use of the river where the pollutants were discharged); *Friends of the Earth v. Consolidated Rail Corp.*, 768 F.2d 57, 61 (2d Cir. 1985) (plaintiffs made actual use and observation of the river where pollutants were discharged).  Moreover, all of these cases were brought under Section 402 of the Clean Water Act and do not discuss injuries arising from future stormwater discharges that may occur as a result of the placement of fill governed under Section 404.

[47] 73 F.3d 546, 553–54, 556 (5th Cir. 1996).

discharges were occurring.  Unlike Cedar Point, Trendmaker has not discharged fill into Armand or Horsepen Bayous where the members claim injuries, and, unlike Sierra Club, Baykeeper's members do not allege any use of the area in or near Trendmaker's placement of fill.

Baykeeper focuses on the injury-in-fact element being a low hurdle, but it provides no evidence showing its members' uses or claimed injuries are any closer than over a mile away. Given the location of the members' alleged injuries, coupled with an immobile pollutant placed on the Property, Baykeeper fails to clear even a low hurdle.

     **B.**    **Baykeeper's claimed injuries from stormwater discharges are not injuries-in-fact because, as permitted discharges, they cannot be "invasions of a legally protected interest."**

The alleged injuries of Baykeeper's members are not injuries-in-fact because they stem from permitted stormwater discharges.  Baykeeper's alleged injuries are water quality impairments in Armand and Horsepen Bayous caused by nutrient loading.[48] These nutrients, according to Baykeeper, originate from rainwater that falls onto the Property and then runs off the land into Armand and Horsepen Bayous.[49]  The runoff of stormwater from a property is subject to regulation under Section 402 of the Clean Water Act.  Stormwater discharges from the Property are permitted, and will be permitted in the future, under construction stormwater and municipal separate storm sewer system ("MS4") permits.[50]

Baykeeper's members have no right to be protected from pollution discharged in compliance with valid permits.  A plaintiff's injury-in-fact can only support standing if it is "an

---

[48] Doc. 35, Galveston Baykeeper, Inc., Resp. to Def.'s Mot. to Dismiss 5, 22; Doc. 35-4, Ross Decl. ¶¶12–16. Although Baykeeper's members testified extensively on the injuries they allege will occur from future third-party home owners, builders, and industrial operations, Baykeeper appears to have disclaimed these injuries as part of the basis for its claim of standing.  *See* Doc. 35, Galveston Baykeeper, Inc., Resp. to Def.'s Mot. to Dismiss 19–20.

[49] Doc. 35, Galveston Baykeeper, Inc., Resp. to Def.'s Mot. to Dismiss 22; Doc. 35-4, Ross Decl. ¶ 12.

[50] *See* Doc. 29-10, Attach. 1 & 2 (Trendmaker stormwater authorization documents); Doc. 29-3, Pier Aff. ¶¶ 15–16, Oct. 22, 2014 (stormwater discharge compliance).

invasion of a legally protected interest."[51]  Stormwater discharges from the Property cannot form the basis of an injury-in-fact because Baykeeper's members have no legally protected interest to be shielded from stormwater discharges authorized by the Section 402 permits.

Baykeeper counters this argument by claiming that its members' recreational, aesthetic, educational, and professional uses and enjoyment are precisely the types of interests and harms repeatedly recognized by the Supreme Court as supporting standing.[52]  The case Baykeeper cites for this proposition, *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, concerns a company's "continuous and pervasive" discharge of pollutants into a river in excess of its discharge permit limits.[53]  Here, however, none of Trendmaker's stormwater discharges from the Property violate the terms of the authorizing stormwater discharge permits.  In addition, in *Laidlaw*, the plaintiff members' claimed interest was in the same river where the defendant's discharge occurred.[54]  In contrast, Trendmaker has not and will not discharge any fill into Armand or Horsepen Bayous where Baykeeper's members claim their use.  If Trendmaker were placing fill in the bayous or on the banks of the bayous, then perhaps Baykeeper could show standing.  But that is not the case here.

Baykeeper also notes that the stormwater permits do not contain effluent limitations for nutrients.[55]  This does not, however, affect the conclusion that nutrients that fall with rainwater from the sky and then run off the Property in compliance with stormwater discharge permits are discharges authorized under the Clean Water Act.  If the right a plaintiff seeks is non-existent or

---

[51] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

[52] Doc. 35, Galveston Baykeeper, Inc., Resp. to Def.'s Mot. to Dismiss 18–19.

[53] 528 U.S. 167, 184 (2000).

[54] *Id.* at 181–82.

[55] Doc. 35, Galveston Baykeeper, Inc., Resp. to Def.'s Mot. to Dismiss 25–26.

has no foundation in law, then there is no legally protected interest, no right capable of judicial enforcement, and no injury capable of judicial redress.[56]  Baykeeper's alleged injuries stem from the authorized discharge of stormwater, and those injuries cannot therefore be invasions of a legally protected interest.[57]

Baykeeper also argues that the Clean Water Act contains no exception to the Section 404 permitting requirement just because the discharger has state or local stormwater authorizations.[58] Defendants do not argue that any exception exists; rather, Baykeeper lacks standing because the alleged water quality injuries are from authorized stormwater discharges, not the placement of fill.

## C.   Baykeeper's claimed flooding injury is speculative, conjectural, and not particularized.

Any alleged injury from flooding is too speculative to support standing.[59]  One of Baykeeper's members, Mark Kramer, claimed that building impermeable surfaces such as subdivisions over the Property's wetlands would cause downstream flooding.[60]  In response to evidence Trendmaker presented showing that development of the Property would not create any new flood risk or increase any off-site flood risk, Baykeeper stated that existing regulatory controls do not purport to impose controls on runoff from storm events that exceed the 100-year

---

[56] *See, e.g.*, *Claybrook v. Slater*, 111 F.3d 904, 907–09 (D.C. Cir. 1997) (finding no standing because a government representative's inaction on an advisory committee did not violate any legal right of plaintiff).

[57] If stormwater pollution is what is invading Baykeeper's interest, then Baykeeper must rely on a violation of Section 402 of the Clean Water Act, which governs stormwater discharges, and not Section 404, which governs the discharge of fill.

[58] Doc. 35, Galveston Baykeeper, Inc., Resp. to Def.'s Mot. to Dismiss 26.

[59] Baykeeper's claims of psychological injury (wetlands loss), scientific interest injury (study of aerial photography of wetlands), and lack of enforcement injury are likewise speculative, conjectural and not particularized. Baykeeper's response neglected to address these claimed injuries.

[60] Doc. 29-6, Kramer Dep. 52:13–24.

14

storm occurrence.[61]   Baykeeper is not entirely accurate.   The development plan includes the required features to detain run-off flows for the 100-year rain event without creating any new or increased flooding risk to downstream properties.[62]   The plan also contains features to contain the 500-year flood event on-site, as confirmed in the Clear Lake City Water Authority's letter of "no objection" for the development.[63]   In order to support standing, a claimed injury must be actual or imminent, and not speculative.[64]   Claims of flooding injuries are simply too speculative to confer standing when they have, for the 500-year flood, less than a 0.2 percent probability of occurring in any given year, and for the 100-year flood, less than a 1 percent probability of occurring in any given year.

## CONCLUSION

For the foregoing reasons, Defendants respectfully pray that the Court grant their Motion to Dismiss Baykeeper's Complaint under Rule 12(b)(1) without prejudice for lack of standing. Defendants further pray that the Court will grant any other and further relief to which Defendants may be justly entitled.

---

[61] Doc. 35, Galveston Baykeeper, Inc., Resp. to Def.'s Mot. to Dismiss 6.

[62] *See* Doc. 29, Trendmaker Mot. to Dismiss 16.

[63] *See* Doc. 29-10, Letter from Lawrence G. Dunbar, Water Resources and Environmental Engineer and Consultant, to James Byrd, Clear Lake City Water Authority (Mar. 31, 2014), at ¶ 3.

[64] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 564 n.2 (1992).

RESPECTFULLY SUBMITTED this 5th day of December, 2014.

*/s/ Sharon M. Mattox*

Sharon M. Mattox
State Bar No. 13234200
Federal I.D. No. 788
SHARON M. MATTOX, PLLC
1414 West Clay
Houston, Texas  77019-4943
Telephone:  (713) 874-9696
Facsimile:  (713) 874-9695
E-Mail:  s.mattox@smattoxlaw.com
ATTORNEY-IN-CHARGE
ATTORNEY TO BE NOTICED

Brandon M. Tuck
State Bar No. 24075182
Federal I.D. No. 2329591
VINSON & ELKINS L.L.P.
1001 Fannin Street, Suite 2500
Houston, Texas  77002-6760
Telephone:  (713) 758-2271
Facsimile:  (713) 615-5048
E-Mail:  btuck@velaw.com
ATTORNEY TO BE NOTICED

**ATTORNEYS FOR DEFENDANTS
TRENDMAKER HOMES, INC., AND
TRENDMAKER CLEAR LAKE, LLC**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 5, 2014, all counsel of record who are deemed to have consented to electronic service are being served with a copy of the foregoing motion via the Court's CM/ECF System for filing.

*/s/ Sharon M. Mattox*
Sharon M. Mattox

17